IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WATERLOO/EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) No. CR07-2012-MWB |
| vs. | ) |
| DAVID DOWNING, | ) |
| Defendant. | ) |

## GOVERNMENT'S NOTICE REGARDING SENTENCING

The United States hereby provides its Notice Regarding Sentencing. The Sentencing Hearing is scheduled for September 9, 2008, at 8:00 a.m.

**A. Government Witnesses:**

At this time, the government anticipates calling SA Chris Cantrell.

**B. Government Exhibits:**

1. Plea agreement

2. Downing Interview

**C. Sentencing Issues:**

The Court will need to resolve the following contested guideline issues: (1) Aggravating Role in the Offense; and (2) Safety Valve. Defendant also seeks a variance from the advisory guideline range. The United States suggests variance may not be warranted.

1

**Aggravating Role under USSG § 3B1.1(a)**

The United States seeks a 3-level increase in the advisory guideline calculation to reflect defendant's aggravating role in the offense under USSG §3B1.1. In relevant part, USSG §3B1.1(b) states that "If the defendant was a manager or supervisor (but not an organizer or leader) of a criminal activity that involved five or more participants, or was otherwise extensive, increase by 3 levels." This guideline encapsulates the Commission's intent to increase levels based on the "both the size of the organization and the degree of the defendant's responsibility." USSG §3B1.1, comment. (backg'd.). Defendant's offense level should be increased by three levels for his role as a manager of supervisor of a criminal activity involving five or more participants or was "otherwise extensive." Even if the court does not find defendant to be a manager or supervisor, defendant qualifies for an increase for "exercising management responsibility" under USSG §3B1.1 comment (n.2).

To determine whether Defendant will have his offense level increased under USSG §3B1.1(b), the Court looks at whether the criminal activity involved five or more participants or was "otherwise extensive." <u>See</u>, *United States v. Morphew*, 909 F.2d 1143, 1145 (8th Cir. 1990). Defendant meets the criteria for an increase under USSG §3B1.1(b) for his role in a criminal activity that "involved five or more participants or was otherwise extensive." The number of participants involved in the criminal activity also assists in determining whether the criminal enterprise is "otherwise extensive." *United States v. Rosas,* 486 F.3d 374, 377 (8th Cir. 2007).

Defendant, J.B., M.M., Michael Breneman, Jeffrey Kopp, Azar Niekamp, Daniel Berger, Juliana Steernberg, Ferrin Dean Doctor, "Z," "Flea" and numerous other shippers, distributers and customers were participants involved in the jointly undertaken criminal activity. (Plea Agreement ¶ 12A-S). In the plea agreement defendant stipulated he first moved to Chicago in the spring of 2005 and began assisting J. B. in the marijuana smuggling business to repay defendant's debt to J.B.. (Plea Agreement ¶ 12M). The marijuana was distributed in Chicago and was also shipped to other locations in the United States including Boston and New York. (Plea Agreement ¶ 12M). Defendant maintained the records that were seized in the search reflecting the sale of approximately 8,412.5 pounds of marijuana and the laundering of over $3,500,000 of drug proceeds. (Plea Agreement ¶ 12K & M). The handwriting in the notebooks that documented the money counted or marijuana received were written by defendant or M. M., aka Munchi. (Plea Agreement ¶ 12M). M. M. assisted defendant on occasion to count cash and make ledger entries. (Plea Agreement ¶ 12M).

In late 2006 or early 2007 J.B. left Chicago and returned to Canada to deal with quality control problems with the marijuana being shipped. (Plea Agreement ¶ 12N). In J.B.'s absence, defendant assumed responsibility for the entire Chicago distribution hub. (Plea Agreement ¶ 12N). After J.B. left for Canada, defendant's share increased to $100 per pound of marijuana shipped with J.B. making $125-150 per pound. (Plea Agreement ¶ 12N). In addition to maintaining the records of marijuana received and the money owed, defendant also counted the money for at least one of the customers in Chicago, who was known to defendant as "Z." (Plea Agreement ¶ 12N). Defendant created and maintained the records of the criminal activity; maintained the Kingsberry

3

house as the business location of the criminal activity; coordinated the delivery of marijuana with the drivers; and coordinated the currency pickups with various couriers. (Plea Agreement ¶ 12N). Although at least one other person made record entries in the drug journals seized by law enforcement, defendant maintained overall responsibility for the accuracy and completeness of the records of drugs received and money shipped. (Plea Agreement ¶ 12N).

In the operation of the hub, defendant maintained contact with the shipping "teams" in Canada via Blackberry. (Plea Agreement ¶ 12O). Each of these teams had their own people responsible for drug delivery and money pick ups. (Plea Agreement ¶ 12O). Defendant directed the drivers to locations for pick up and delivery of marijuana and currency. (Plea Agreement ¶ 12O, anticipated testimony of SA Cantrell). In the controlled delivery on May 18, 2007, defendant directed Kopp to the location in Chicago where the controlled delivery took place. (Plea Agreement ¶ 12J, anticipated testimony of SA Cantrell).[1]

Also, Defendant used the unwitting services of commercial truck drivers in the commission of the offense. The marijuana was smuggled into the United States from Canada by a variety of methods including air drops, hollow logs, sawdust trucks, propane trucks and shipping containers with the walls lined with marijuana. (Plea Agreement ¶ 12E). In the last marijuana shipment, the marijuana was hidden in the walls of a shipping container and driven across the border by a delivery driver, who had no knowledge of the marijuana secreted in the "empty container." . (Plea Agreement ¶

---

[1] Although at this point Kopp was no longer a participant, this activity is indicative of defendant's actions regarding the drivers.

4

12C, D & E, anticipated testimony of SA Cantrell).  USSG §3B1.1 Comment (n.3) provides that a smaller fraud that uses the "unknowing services of many outsiders could be considered extensive."  This enterprise is "otherwise extensive."

Courts may also consider the amount of money involved in a criminal enterprise to determine whether the operation was "extensive."  In *Morphew,* the Court found that as long there was evidence that Defendant supervised or organized at least one person, the Court could look at the size of the enterprise and amount of money coming in to determine whether the criminal operation was "otherwise extensive" under USSG §3B1.1.  "Whether or not there were five or more persons involved, it is plain that an enterprise generating a 'take' of over a quarter million dollars can properly be regarded as 'extensive."  *United States v. Morphew*, 909 F.2d 1143, 1145 (8th Cir. 1990).  The drug ledgers seized showed the sales from 2005 and 2006, in which defendant and his coconspirators were responsible for the distribution of approximately 8,412.5 pounds of marijuana and the transmission of over $3,500,000 of drug proceeds.  (Plea Agreement ¶ 12K).  These records showed further distribution of the marijuana to New York and Boston.  (Plea Agreement ¶ 12K).  That is far greater than the amount of money involved in *Morphew.*  The Court should consider this strong evidence of the extensiveness of the operation.

Yet another factor in determining whether an operation was "otherwise extensive" is the "nature and complexity of the operation and its geographical reach."  *United States v. Rosas*, 486 F.3d 374, 377 (8th Cir. 2007) (quoting *United States v. Vasquez-Rubio*, 296 F.3d 726, 729 (8th Cir. 2002).  The criminal activity of defendant

had a wide geographic reach. The marijuana initially came from British Columbia, Canada and was transported to Chicago through various area, including Iowa. The marijuana was further distributed in Chicago, Boston and New York. (Plea Agreement ¶ 12M). The currency was delivered back to Chicago, and then transported to the shipping "teams" in Canada via California. (Plea Agreement ¶ 12P).

Even if the Defendant does not meet the requirements for an increase in offense level as a "supervisor or manager," defendant may still warrant an increased sentence level under USSG §3B1.1 comment (n.2), which provides, "an upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of the criminal organization." Defendant in this case undoubtedly exercised "management responsibility" over "assets" or "property" in a "criminal organization." In *United States. v. Lalley*, 317 F.3d 875, 877-8 (8th Cir. 2003), the defendant had signatory authority and controlled the bank account related to the criminal enterprise. *Id.* at 877. The district court found that the defendant should have his offense level increased by two levels because he exercised "management responsibility" of the assets of a "criminal organization." *Id.*

Defendant had much more responsibility than the defendant in *Lalley* over the assets and property of the criminal activity. Defendant had records documenting the distribution of marijuana and was found with over $74,000 in the Kingsberry house. Defendant at the very least exercised "management responsibility" over the "assets" of a "criminal organization." "Assets" in this case would be the marijuana and the cash.

6

Therefore, if the Court does not find that an increase is warranted under USSG §3B1.1(b), it could still use the authority of USSG §3B1.1 comment (n.2) to increase defendant's sentence to reflect an aggravating role in the offense. Defendant should receive an upward departure for his role in the offense.

**Safety Valve**

Defendant asserts he is eligible for a reduced sentence under the provisions of USSG §§5C1.2 and 2D1.1(b)(11), commonly called the "safety valve." The plea agreement provides:

> The parties stipulate and agree: 1) defendant did not use violence or possess a firearm; (2) the offense did not result in death or serious bodily injury; and 3) it appears defendant has truthfully provided to the government all information defendant knows concerning the instant offense. Assuming defendant continues to meet these three criteria and also meets the other criteria of USSG §5C1.2, he may be eligible for a 2-level reduction under USSG §2D1.1(b)(11) and may not be subject to the 10-year mandatory minimum. The United States asserts defendant is not eligible for these reductions. The parties agree to litigate this adjustment at sentencing.

(Plea Agreement ¶ 15F). The remaining criteria of the safety valve are: 1) that defendant does not have more than one criminal history point; and 2) that defendant did not have an aggravating role in the offense. The United States concurs defendant has no criminal history points. The only dispute involves defendant's aggravating role

7

in the offense.  The court's determination of role in the offense, will also resolve the factual dispute regarding safety valve applicability.

Respectfully submitted,

MATT M. DUMMERMUTH
United States Attorney

By, /s/ Patrick J. Reinert

PATRICK J. REINERT
Assistant United States Attorney
P.O. Box 74950
Cedar Rapids, IA 52407-4950
319-363-0091
319-363-1990 (fax)
Pat.Reinert@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2008, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following:
    Todd Pugh

UNITED STATES ATTORNEY

BY:   /s/ M. Gosse