IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN WATERLOO DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

    vs.              No. CR07-2012

DAVID ANTHONY DOWNING,       TRANSCRIPT OF
                         SENTENCING
    Defendant.
_____/

    The Sentencing held before the Honorable Mark W.
Bennett, Judge of the United States District Court for the
Northern District of Iowa, at the Federal Courthouse, 320 Sixth
Street, Sioux City, Iowa, September 9, 2008, commencing at 8:01
a.m.

APPEARANCES

For the Plaintiff:    PATRICK J. REINERT, ESQ.
                    Assistant United States Attorney
                    Hach Building - Suite 400
                    401 First Street Southeast
                    Cedar Rapids, IA 52401-1825

For the Defendant:    TODD S. PUGH, ESQ.
                    THOMAS M. BREEN, ESQ.
                    Thomas M. Breen & Associates
                    Suite 1460
                    53 West Jackson Boulevard
                    Chicago, IL 60604

                    STEVEN C. RUECKERT, ESQ.
                    Suite 1410
                    53 West Jackson Boulevard
                    Chicago, IL 60604

Also present:        Stacy Sturdevant, U.S. Probation
                    Christopher Cantrell

Reported by:         Shelly Semmler, RMR, CRR
                    320 Sixth Street
                    Sioux City, IA 51101
                    (712) 233-3846

---

1     THE COURT: Thank you. Please be seated. Good

2 morning. Our first sentencing among five today is United States

3 of America versus David Anthony Downing. Mr. Downing is

4 personally present represented by Todd Pugh from Chicago. The

5 U.S. Attorney's Office is represented by Assistant U.S. Attorney

6 Pat Reinert, and we're here for sentencing this morning.

7     Mr. Pugh, have you had a full, fair, and complete

8 opportunity to review the presentence report with Mr. Downing?

9     MR. PUGH: I have, Your Honor.

10     THE COURT: Okay. And let's -- why don't we go ahead

11 and admit the exhibits. Government has Exhibits 1 and 2?

12     MR. REINERT: That's correct, Your Honor.

13     THE COURT: Okay. One would be the plea agreement,

14 and two is the -- is it the DEA report?

15     MR. REINERT: It's actually the debriefing of the

16 defendant written by the --

17     THE COURT: Homeland Security.

18     MR. REINERT: Yes, Your Honor.

19     THE COURT: Okay. And I've read both of those. So

20 any objection, Mr. Pugh?

21     MR. PUGH: No objection, Your Honor.

22     THE COURT: Okay. Government's Exhibits 1 and 2 are

23 received.

24         * * * *

25     (Government Exhibits 1 and 2 were admitted.)

---

1         * * * *

2     THE COURT: And then defendant, we have Exhibits A

3 through L which are all -- well, B through L would be supporting

4 letters, and A is defendant's handwritten, poorly duplicated,

5 virtually impossible-to-read life story. So any objection to

6 Defendant's Exhibits A through L?

7     MR. REINERT: Absolutely none, Your Honor.

8     THE COURT: When I meant poorly written, I wasn't

9 commenting on the quality of the writing. It's just virtually

10 impossible for me to read a couple times' duplicated

11 handwritten -- it was just very difficult. I was up till almost

12 one o'clock last night trying to wade through it, and there were

13 a lot of words I just couldn't understand. So I don't know why

14 one wouldn't have that retyped so I could read it in half the

15 time or less, but apparently you're not willing to assist me

16 like that, so I had to struggle through it.

17     Okay. In this case probation has scored a total

18 offense level 36, criminal history category 1. There's a

19 mandatory minimum 10-year life (sic) sentence. The advisory

20 guideline range is 188 to 235 months.

21     However, the defendants are contesting the three-level

22 role enhancement. And if I sustain their objection and find

23 that probation improperly scored the defendant with a 3-level

24 role enhancement, then the defendant would get 3 points off,

25 become safety valve eligible, get 2 additional points off, wind

---

1 up at a total offense level 35, criminal history category 1.

2 The 10-year mandatory minimum would be off the table, and the

3 new guideline range would be 108 to 135 months.

4     Mr. Pugh, do you agree with those guideline

5 calculations?

6     MR. PUGH: We do agree with that sentencing range,

7 Your Honor.

8     THE COURT: Okay. And you're going to have to have

9 the microphone so my court reporter can take down what you say

10 because I'm not interested in resentencing in this case.

11     Mr. Reinert, did I adequately state those guideline

12 calculations?

13     MR. REINERT: Yes, Your Honor.

14     THE COURT: Okay. Now, I have a matter that I want to

15 take -- and then we have the defendant's motion for downward

16 variance.

17     But before we get to that, I have a matter that I

18 wanted to take up, and that is it's mentioned in the defendant's

19 variance motion, but to me it's a little more important than

20 that, and that is the application, if any, of the recent United

21 States Supreme Court case on June 2 of this year, United States

22 versus Santos. I believe the defendant pled guilty in March, I

23 think March 8. Santos was decided on June 2.

24     And as I understand the defense position is you claim

25 that he may not be guilty of money laundering under Santos but

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 1 of 24

1 you're not moving to withdraw your plea and you just kind of
2 want me to consider in the mix of the variance the effect, if
3 any, of United States versus Santos on the defendant. Is that a
4 fair summary?
5     MR. PUGH: That is correct, Your Honor.
6     THE COURT: Well, here's the problem I have with that.
7 I'm concerned that it's either plain error or ineffective
8 assistance of counsel, and we're going to need to make a record
9 on both so that it doesn't come back to me on that issue.
10     And I'm not saying -- I'm not saying that you were
11 ineffective in not seeking to withdraw the guilty plea. I'm
12 saying that if the defendant gets a longer sentence than he's
13 hoping for and changes lawyers, that could easily be an argument
14 raised. And I have enough 2255 proceedings as it is.
15     Just to give you an example, at the end of the day
16 today, I will have sentenced 20 defendants this month, in the
17 first 9 days of this month with a holiday in between. So we
18 have a -- it's not like Chicago. Our criminal caseload is five,
19 six times what the district court judges have there. And so I
20 see it as a potential red flag in the case.
21     And I understand why there's all kinds of reasons one
22 would consider it and decide to go ahead. I'm not second
23 guessing your judgment. I just want to make a record now that
24 would possibly, one, either make it more difficult or, two,
25 preclude a 2255, at least on that issue. There may be other

1 issues lurking that I'm unable to foresee. And so I just think
2 we need to make some kind of record on it.
3     And my understanding from probation, Mr. Pugh, is that
4 this was discussed at some length. It's not something you were
5 unaware of. You were clearly aware of the decision in United
6 States versus Santos. You had, I assume, ample opportunity
7 after it was decided on June 2 to study it and determine what,
8 if any, steps you wanted to take. And if you want to withdraw
9 your guilty plea, I'd be happy to let you do it even today in
10 light of United States versus Santos.
11     So I want to make sure you understand I consider it
12 good cause for withdrawing a guilty plea. It may ultimately not
13 be in your best interests to do that, and only you and your
14 client can decide that. And I'm not suggesting that you should
15 withdraw your guilty plea or that it would be in your client's
16 best interests to withdraw the guilty plea. I'm simply
17 suggesting that in light of the case if you want to withdraw the
18 guilty plea you can.
19     And I just want to make sure that you've had all of
20 those discussions with your client and that we put that on the
21 record, not what you actually discussed because I don't want to
22 invade your attorney-client privilege. But I do want to make a
23 record that Mr. Downing is proceeding with a knowing and
24 intelligent waiver of his right to withdraw the guilty plea.
25     And so I'm going to call on you to ask your client

1 some questions. You can give a professional statement
2 indicating, you know, if you have considered Santos. I know you
3 have because I've talked to probation. And then just make a
4 record by asking your client a few questions to establish that
5 the decision not to withdraw the guilty plea is a knowing,
6 intelligent decision; it was a decision based on strategy. And
7 I think that would eliminate any problems down the road. So are
8 you able and willing to do that, Mr. Pugh?
9     MR. PUGH: I am, Your Honor. Would you like me to do
10 it from the podium?
11     THE COURT: Whatever you're more comfortable with. If
12 you'd rather remain seated, that's perfectly fine.
13     MR. PUGH: I'd like to stand before Your Honor if you
14 don't mind.
15     THE COURT: Okay. And that podium is adjustable
16 heightwise.
17     MR. PUGH: I think it's perfect.
18     THE COURT: Okay. Thank you.
19     MR. PUGH: Your Honor, just sort of as a preliminary
20 matter regarding the Santos opinion and the arguments that we
21 raised therein, in order to make a record in this case -- and I
22 will pose some questions to Mr. Downing -- when the Santos
23 opinion came out, it created a bit of a stir, and caused us
24 to go back and look at the offense conduct in this case, the
25 stipulated conduct, and to go a little deeper into the discovery

1 in this case to see how the opinion in Santos may affect the
2 money laundering conviction that we had already pled guilty to
3 in this case.
4     Having had the opportunity to go through the Santos
5 opinion and bearing in mind that it was a plurality opinion and
6 since that time there's been some judicial and scholarly input
7 regarding that opinion of whether or not being a plurality
8 opinion that we probably should look to Justice Stevens' swing
9 vote as really being the crux of that opinion, and after reading
10 that opinion and looking at the discovery in this case, I
11 certainly had an opportunity and did take the opportunity to
12 discuss the impact on Santos with the government in this case,
13 to inquire of the government what their position would be. And
14 the government's reading of Santos is consistent with what I
15 indicated in a footnote within our variance motion.
16     THE COURT: Well, that's ridiculous. The government's
17 position is totally -- it's not ridiculous. It's ludicrous to
18 say that Santos is limited to gambling cases. If that's their
19 position, it's one of the more inane positions I've ever seen
20 the Department of Justice take. And I've seen several. But
21 this goes right up at the top of the list because there's
22 nothing in that opinion indicating that it's limited to gambling
23 opinions. And if you actually look at the sections that make up
24 the actual holding of the case, they don't even discuss the
25 facts in the case. It's absolutely clear I think to anybody

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 2 of 24
to purchase a complete copy of this transcript.

1  with a pulse and an IQ in double digits that it doesn't apply
2  just to gambling cases. But again, that's my own view.
3  MR. PUGH: And that was our opinion as well, Your
4  Honor. And as early as -- well, as early as Sunday I
5  shepardized the Santos opinion to see whether or not -- you
6  know, how Santos was being treated in other districts.
7  THE COURT: And I'm sure no federal judge in the
8  country has limited it to gambling cases.
9  MR. PUGH: That is correct. Actually the most recent
10  cases actually that I have found have been treating it on
11  forfeiture allegations, and I haven't even seen a case even
12  close to the case that we have before Your Honor receiving
13  appellate review or even district court review as of yet.
14  But nonetheless, I did discuss the issues with
15  Mr. Downing, and I also discussed with Mr. Downing the
16  government's position which would be we have a plea agreement
17  and that, you know, the government's position would be if we
18  move to withdraw any of the pleas to either Count 2 or 3 in this
19  case it would be a violation of the plea agreement, we'd be back
20  to square one.
21  Certainly the government would probably take the
22  position -- I explained this with Mr. Downing that acceptance of
23  responsibility may be a particular issue and any other
24  concessions that we would be expecting to receive from the
25  government in this case in terms of substantial assistance would

1  certainly be put in jeopardy.
2  Mr. Downing and I discussed these issues. I covered
3  the Santos case with him over at the Dakota County Jail. I
4  actually had given him a copy of it to read, you know, for what
5  that was worth to see if he had any questions regarding it. And
6  I gave Mr. Downing my input on how I believe Santos would shake
7  out in this case. We did kind of a cost benefit analysis.
8  In the end, I explained to Mr. Downing that if we were
9  successful, if the Court were to find and allow us to withdraw
10  our guilty plea, we would be looking at a quantum benefit of two
11  points under the guidelines.
12  And due to the fact that we would be risking not
13  receiving our substantial assistance and our adjustments under
14  chapter 5 from the government, we felt as if, based on the
15  opinion -- and granted, a plurality opinion that definitely I
16  believe left open the issue in drug cases and the facts and
17  circumstances of this case, we made the decision that we would
18  leave our guilty plea in place.
19  And after my discussions with probation, I decided
20  that I would take the Santos opinion into the 3553(a) factors.
21  Nobody had done it before, and I thought it was important to get
22  that issue into this motion and before the Court.
23  So one of the reasons that the Court has had a concern
24  with is that maybe nobody looked at this issue. Well, we have
25  looked at this issue as attorneys in this case since day one

1  that the opinion was issued, discussed it with Mr. Downing, and
2  have come to the conclusion that 3553(a) was a middle ground and
3  a good place to vet this issue.
4  THE COURT: And it wasn't that I didn't think you had
5  done everything you did which is actual -- is commendable and
6  what one would hope that an excellent criminal defense lawyer
7  would do. I was told you did that by probation, but there
8  wasn't anything in the sentencing record.
9  MR. PUGH: Certainly.
10  THE COURT: So it wasn't that I was questioning your
11  judgment or ability, you know. I think you went above and
12  beyond what a typical criminal defense lawyer that I would see
13  would do. I mean, most lawyers that I see, they'd read it, say,
14  ah, it doesn't apply, never even mention it to their client. So
15  you've gone way above to what I'm used to seeing.
16  And so I applaud your efforts, and, you know, I think
17  you've set the gold standard on what to do in a situation like
18  this. And I'm not trying to second guess your judgment on it at
19  all. I just want to make the record, and we're doing that, so
20  thank you.
21  MR. PUGH: Very well. And I would inquire of
22  Mr. Downing with leave of the Court at this time.
23  THE COURT: Yes.
24  MR. PUGH: David, maybe you'd rise to address the
25  Court. David, you've heard the representations that I've made;

1  correct?
2  THE DEFENDANT: Correct. Correct.
3  THE COURT: You can remain seated. I think it's a
4  little easier for you, Mr. Downing. I don't stand on much
5  formality, so as long as -- it's more important to have the
6  microphone so my court reporter doesn't jump up and slug me and
7  she can take down everything you say than it is to stand up
8  so . . .
9  THE DEFENDANT: Thank you.
10  MR. PUGH: In terms of the representations that I just
11  made to the Court regarding the Santos opinion and the impact
12  that that would have on your money laundering conviction in this
13  case, did we fully discuss all the issues regarding Santos?
14  THE DEFENDANT: Yes, sir.
15  MR. PUGH: And did we together, yourself and myself,
16  come to a decision that after weighing the pros and cons of the
17  Santos decision versus what we expected from the government in
18  terms of the assistance that we provided the government, we made
19  a decision to not withdraw your guilty plea; is that correct?
20  THE DEFENDANT: Yeah, it is correct.
21  MR. PUGH: And having heard the representations that
22  I've made and the statements from the Court this morning, is it
23  still your desire to move forward to sentencing and not withdraw
24  your guilty plea in regards to both counts?
25  THE DEFENDANT: Yes, sir.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS  Document 180  Filed 10/30/08  Page 3 of 24

1 THE COURT: And, Mr. Pugh, is it fair to characterize
2 the decision that you and Mr. Downing collectively made as a
3 strategic decision as part of your trial and sentencing strategy
4 in the case? MR. PUGH: It is, Your Honor.
5 MR. PUGH: It is, Your Honor.
6 THE COURT: Okay. And, Mr. Downing, do you agree with
7 that, that it was a strategic decision?
8 THE DEFENDANT: Yes, sir.
9 THE COURT: Okay. And I just want to make sure -- I
10 think you heard me say it, but I want to make sure you both
11 understand. I think it's already in the record, but just out of
12 an abundance of caution, I would allow you to withdraw the
13 guilty plea if you want to. And, Mr. Pugh, I think you
14 understand that.
15 MR. PUGH: I do, Your Honor.
16 THE COURT: Okay. And, Mr. Downing, you understand
17 that.
18 THE DEFENDANT: Yes, Your Honor.
19 THE COURT: Okay. Good. Thank you very much.
20 MR. PUGH: Thank you, Judge.
21 THE COURT: Okay. That takes care of preliminary
22 matters as far as I'm concerned. Anybody else have any
23 preliminary matters?
24 MR. REINERT: No, Your Honor. The only additional
25 thing I would add to what Mr. Pugh and I -- Mr. Pugh and I

1 talked about Santos almost immediately, and I talked to him
2 first initially about what the department's position was on the
3 applicability of Santos.
4 THE COURT: Is that still their position, it only
5 applies to gambling cases?
6 MR. REINERT: I've not seen any further guidance on
7 it, but even assuming it doesn't only apply to gambling cases --
8 THE COURT: Do you personally as an officer of the
9 Court think it only applies to gambling cases?
10 MR. REINERT: The department says it only applies to
11 gambling cases. I think one might be hard pressed to read it
12 that narrowly. I think it probably does apply to other cases,
13 but part of our discussion Mr. Pugh and I had was the facts that
14 we wrote in the plea agreement that we stipulated to were kind
15 of in the pre-Santos world as to what the facts we needed. And
16 as you dig down into the facts, there were -- there is an
17 ability to separate the profits from the -- I'm not sure what
18 you would call them anymore -- proceeds.
19 THE COURT: Proceeds, receipts I guess.
20 MR. REINERT: Receipts, that's probably the best way
21 to put it.
22 THE COURT: That was the dichotomy in Santos, profits
23 and receipts.
24 MR. REINERT: And that there were transactions --
25 there were sufficient facts to show money laundering

1 transactions with profits as well which would support the plea
2 but might change -- if one were to go into the other portion of
3 the money laundering guideline where you have to go to the fraud
4 tables, it might change the amount of the proceeds laundered.
5 THE COURT: Okay. Thank you. Okay. Obstruction of
6 justice is really the -- and then the variance but -- I'm sorry.
7 Role in the offense is really the fighting issue. Again, like I
8 said, by the end of the day I will have had nine sentencings
9 yesterday and today, and so it's hard to keep them all straight.
10 So I've read literally thousands of pages of material so -- but
11 we have -- role in the offense is the hotly contested issue
12 because of the bearing that that has on safety valve eligibility
13 and the three points in and of itself and then the five-point
14 swing and the waiver of the mandatory minimum. So obviously
15 that's one of the huge fighting issues in the case along with
16 the variance.
17 Do you have some evidence you're going to present on
18 the role in the offense issue, Mr. Reinert?
19 MR. REINERT: Very briefly, Your Honor. I've got
20 Agent Cantrell here for a couple of issues, and I think I
21 actually cited in my sentencing memo what I anticipated him to
22 talk about. It shouldn't take very long.
23 THE COURT: Oh, that's fine. You take your time.
24 I've got another sentencing at nine, but I don't intend to be
25 able to start it on time, so we're just going to have to run

1 late.
2 MR. REINERT: We'd call Agent Cantrell.
3 THE COURT: Thank you.
4 CHRISTOPHER CANTRELL, PLAINTIFF'S WITNESS, SWORN
5 THE COURT: Okay. Thank you. Please be seated in the
6 witness box. Make yourself comfortable. Please adjust the
7 chair and the microphones so you can speak directly into them.
8 And would you state your full name, please, and spell your last
9 name.
10 THE WITNESS: Christopher Steven Cantrell,
11 C-a-n-t-r-e-l-l.
12 THE COURT: Thank you very much.
13 And, Mr. Reinert, whenever you're ready.
14 DIRECT EXAMINATION
15 BY MR. REINERT:
16 Q. Agent Cantrell, did you participate in the investigation of
17 Mr. Downing?
18 A. Yes, sir, I did.
19 Q. And have you reviewed the reports not only written by
20 yourself but also the reports written by others in this case?
21 A. Yes, sir, I have.
22 Q. First of all, turning to the issue of drivers, based upon
23 what you learned from Mr. Downing's debriefing, what did you
24 find out about how drivers were sent from Canada into the United
25 got to Chicago? What was Mr. Downing's role in meeting those

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS  Document 180  Filed 10/30/08  Page 4 of 24

1 drivers or meeting with those drivers?

2 **A.    It's my understanding after multiple interviews with**

3 **Mr. Downing that the drug organization would contact him usually**

4 **via Blackberry and ask him to get a prepaid cellular phone and**

5 **provide them that number.  That number would then be provided to**

6 **a driver.  The driver would, once they were nearing Chicago,**

7 **notify Mr. Downing that they were coming into the area.**

8 **Mr. Downing would direct them to meet him in a certain part of**

9 **the city where he would take the marijuana from the driver.**

10 **Q.**    When there was a -- was there a controlled transaction in

11 this case as well or controlled delivery to Mr. Downing?

12 **A.    Yes, sir, there was.**

13 **Q.**    When the law enforcement officers were trying to deliver to

14 Mr. Downing, how did that work with the person who was --

15 Mr. Downing believed at least at that time to be a driver from

16 one of the organizations?

17 **A.    The driver contacted Mr. Downing to let Mr. Downing know he**

18 **was in the Chicago area.  Mr. Downing instructed the driver to**

19 **come to the downtown Chicago area and then notify him once he**

20 **was in the downtown area.**

21 **Q.**    And was a particular location selected by Mr. Downing

22 initially, or was that a subsequent development?

23 **A.    That was -- that location was based on where the driver**

24 **called Mr. Downing from after he got in the downtown area.**

25 **Q.**    You said that the organizations would send marijuana across

1 the border.  How -- without giving away any trade secrets, how

2 was that accomplished by the organization?

3 **A.    The organization collects marijuana from various growers in**

4 **Canada.  And once they have what they deem is a sufficient**

5 **amount to send a load to the United States, they contract with**

6 **somebody to deliver that marijuana to their actual distributors**

7 **in the United States.  That information is relayed to the**

8 **distributors via Blackberry, and that's how they control the**

9 **organization and keep everything moving.**

10 **Q.**    How does it get from the driver -- or from the place where

11 the marijuana's put into the truck to the United States?  Is it

12 one of the members of the conspiracy that's driving these loads,

13 or how does that work?

14 **A.    No.  It usually involves a innocent third party that's**

15 **contracted to move any number of items across the border that**

16 **have marijuana secreted in them.**

17 **Q.**    Now, did -- just so the record's clear, on the contracting

18 with these trucking companies or the third parties, was that

19 something Mr. Downing was doing or that someone else was doing?

20 **A.    To my knowledge, Mr. Downing did not make those contracts.**

21          MR. REINERT:  Nothing further, Your Honor.

22          THE COURT:  Mr. Pugh?

23          MR. PUGH:  My partner, Mr. Breen, with leave of the

24 Court will be inquiring of Agent Cantrell.

25          THE COURT:  Sure.

1          MR. BREEN:  May I have just a moment, Your Honor?

2          THE COURT:  You may.

3          MR. BREEN:  Your Honor, if I could introduce myself.

4          THE COURT:  Yes.  I was just going to ask you about

5 that.

6          MR. BREEN:  My name is Tom Breen, B-r-e-e-n, and since

7 the inception of this case, Todd Pugh and I have become

8 partners.  I think it was originally my firm that filed an

9 appearance.  I'm not too sure of the chronology.

10          THE COURT:  Well, welcome from the Northern District

11 of Illinois to the Northern District of Iowa.

12          MR. BREEN:  Thank you, Your Honor.

13          THE COURT:  Nice to have all of you here today.

14                    CROSS-EXAMINATION

15 BY MR. BREEN:

16 **Q.**    Agent, how many times did you interview David Downing?

17 **A.    I believe we had two interviews with Mr. Downing.**

18 **Q.**    You indicated just moments ago if I'm not mistaken that

19 when drivers from Canada would get to the Chicago area they

20 would call or make contact with David Downing; correct?

21 **A.    Sir, I believe I stated when the drivers got in the area of**

22 **Chicago they did contact Mr. Downing.  I don't believe I stated**

23 **that they were actually from Canada.**

24 **Q.**    Oh, okay.  Well, when the drivers got to the Chicago area,

25 you indicated that they contacted David Downing; correct?

1 **A.    Yes, sir.**

2 **Q.**    And you wrote up what are referred to as 302s or official

3 reports of all these interviews that you had of David Downing,

4 did you not?

5 **A.    Yes, sir, I did.**

6 **Q.**    At any point in any of those reports do you indicate that

7 David Downing directed these drivers where to go to meet him?

8 **A.    I'm not -- I'm not sure I do.**

9 **Q.**    Pardon me?

10 **A.    I'm not sure I do.**

11 **Q.**    You're not sure you do what?

12 **A.    Indicate that Mr. Downing has directed the drivers.**

13 **Q.**    Well, in fact, there was an event at Home Depot, was there

14 not, where a load was delivered?

15 **A.    I believe there was.**

16 **Q.**    And what happened was the drivers came to Home Depot and

17 contacted David Downing and told him to meet them at Home Depot;

18 isn't that right?

19 **A.    Are you referring to the controlled delivery, sir?**

20 **Q.**    Yes.

21 **A.    During the controlled delivery when the driver called**

22 **Mr. Downing, Mr. Downing told the driver to go to the downtown**

23 **Chicago area and contact him once he was there, and that is what**

24 **occurred.**

25 **Q.**    And what occurred was the driver picks out a parking lot

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 5 of 24

1 and calls Downing and tells him to meet him at the parking lot;
2 correct?
3 **A. I'm not sure if that happened in every case, but in our**
4 **case in our controlled delivery, the driver did contact**
5 **Mr. Downing once he proceeded to the downtown area as directed**
6 **and told Mr. Downing where he was at.**
7 Q. Okay. So the driver chose the location to meet Downing in
8 that controlled case. It's a simple question, Agent.
9 **A. Well, I'm not sure it's that simple, sir.**
10 Q. Well, let me move on for a minute if I may. In the reports
11 that you wrote up -- first of all, you've submitted written
12 reports, have you not, to Mr. Reinert?
13 **A. Yes, sir, I have.**
14 Q. And these reports were typed up when?
15 **A. They were typed up recently within the last few weeks based**
16 **on notes I took at the time of the interview.**
17 Q. And the interviews took place on what days again?
18 **A. I believe one of them was the end of last year, and the**
19 **other was the beginning of this year.**
20 Q. Okay. And you knew, sir, when you were typing up these
21 reports that the role of Mr. Downing in this escapade was an
22 issue of some concern both to Mr. Reinert as well as to
23 Mr. Pugh; correct?
24 **A. Yes, sir, I believe I did.**
25 MR. BREEN: Your Honor, may I approach the witness?

1 THE COURT: Yes, you may.
2 BY MR. BREEN:
3 Q. I'm going to show you, sir, what purports to be a copy of
4 Government's Exhibit 2 for identification. And I'm going to
5 call your attention, first of all, to the cover page. And take
6 a look at this document, this Exhibit 2, if you will. And is
7 that a copy of your report summarizing the interviews of David
8 Downing?
9 **A. Yes, sir, this is a copy of the report from December 17,**
10 **and I believe the subsequent interview report's also here.**
11 Q. And this was typed up when?
12 **A. It says that the report was approved on August 29 of this**
13 **year.**
14 Q. August 29, okay. Go to page 5, your page 5 of this --
15 first of all, let me get the right terminology. What would you
16 refer to this report as?
17 **A. A report of investigation.**
18 Q. Okay. Would you go to page 5 of the report of
19 investigation, please.
20 **A. Yes, sir.**
21 Q. And if you will, sir, go to the second to last paragraph
22 of -- on that page, and I'm going to ask you, sir, in that
23 paragraph does it describe how loads were brought to the Chicago
24 area and how it was Downing knew where to pick up the load?
25 **A. It does describe the basic process of how the loads are**

1 coordinated from Canada to the Chicago area, sir.
2 Q. And it reads, sir, if I'm not mistaken, when a load of
3 marijuana was ready to be shipped to the United States, one of
4 the transportation teams would contact Downing and tell him to
5 get a new prepaid cell phone. Is that correct?
6 **A. Yes, sir.**
7 Q. So Downing is taking directions from some other individual;
8 is that correct?
9 **A. Yes, sir.**
10 Q. Downing would then provide the transportation team with a
11 telephone number so the load driver could contact him and
12 arrange delivery; correct?
13 **A. Yes, sir.**
14 Q. Further it says that the driver of the loads would contact
15 Downing when they arrived in Chicago so that he, Downing, could
16 pick up the load. Is that correct?
17 **A. Yes, sir.**
18 Q. And that indicates, sir, that the drivers are telling him
19 where to pick up the load; correct?
20 **A. No, sir, it does not.**
21 Q. Anywhere in this report, sir, does it indicate that David
22 Downing chose the delivery site?
23 **A. May I have a moment to review the report further?**
24 Q. Certainly.
25 **A. The report does not specifically say that Downing ordered**

1 the load drivers where to take the loads.
2 Q. By the way, these load drivers you indicated to Judge
3 Bennett were innocent third parties?
4 **A. Those who were bringing the marijuana from Canada to the**
5 **United States, yes.**
6 Q. But after that, were there different drivers employed?
7 **A. Yes. Typically the drivers that are employed to bring the**
8 **marijuana into the United States are not the same drivers that**
9 **bring the marijuana to the distributors.**
10 Q. Well, in this instance, in this case, two of the drivers
11 that brought the marijuana to the Chicago area were fellas by
12 the name of Kopp and Breneman; isn't that right?
13 **A. Yes, sir, it is.**
14 Q. They certainly weren't innocent third parties; correct?
15 **A. No, sir, they were not.**
16 Q. And they were hired by someone in Canada; correct?
17 **A. It's my understanding they were employed by a gentleman**
18 **from Washington state.**
19 Q. And what was his name?
20 **A. Dean Farren Doctor if I recall correctly.**
21 Q. So they were hired by somebody in Washington state, and
22 they were paid by that same person in Washington state?
23 **A. Yes, sir, that's my understanding.**
24 Q. And in the one instance, the one controlled buy, the
25 specific one that's being watched by law enforcement officers,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 6:07-cr-02012-MWB-LTS Document 180 Filed 10/30/08 Page 6 of 24
to purchase a complete copy of this transcript.

1 the drivers, when they arrive in the Chicago area, they call
2 David Downing and tell him where to come for the delivery; isn't
3 that right?
4 **A.   I believe the way that transaction occurred is they first**
5 **called Mr. Downing.  Mr. Downing directed them to the downtown**
6 **area.  And when they arrived there, they called Mr. Downing**
7 **again to let them know they had arrived in downtown and where**
8 **they were, and Mr. Downing told them that he would be right**
9 **there to collect the marijuana.**
10 **Q.**   You like using that phrase to the downtown area; correct?
11 **A.   Yes, sir.**
12 **Q.**   And you're talking about downtown Chicago; correct?
13 **A.   Yes, sir.**
14 **Q.**   A city of about three and a half million people; correct?
15 **A.   I don't know what the population of Chicago is.**
16 **Q.**   A county of about seven and a half million people; correct?
17 **A.   I have no idea what the population of Cook County is, sir.**
18 **Q.**   But whoever -- wherever Kopp or others decide to bring the
19 load, they then call David Downing to tell him where they are,
20 isn't that right, or at least in the controlled situation?
21 **A.   In the controlled delivery, that's what occurred, sir, yes.**
22         MR. BREEN:  If I may have a minute.
23 **Q.**   By the way, this Kopp and Breneman -- and I think it's
24 probably very clear in the record, but Kopp and Breneman didn't
25 just deliver marijuana to David Downing, did they?

1 **A.   No, sir, they did not.**
2 **Q.**   They delivered marijuana to other people; correct?
3 **A.   Yes, sir.**
4 **Q.**   And that was in the Chicago area?
5 **A.   Yes, sir.**
6 **Q.**   And was that outside the Chicago area?
7 **A.   It's my understanding that all occurred in the Chicago**
8 **area.**
9 **Q.**   So Kopp and Breneman were always delivering in the, quote,
10 Chicago area, unquote; correct?
11 **A.   To the best of my knowledge.**
12         MR. BREEN:  I have nothing further.  Thank you.
13         THE COURT:  Thank you, Mr. Breen.
14         Mr. Reinert?
15         MR. REINERT:  Nothing, Your Honor.
16         THE COURT:  You may step down.  Thank you.
17         THE WITNESS:  Thank you.
18         THE COURT:  Any additional evidence by the government?
19         MR. REINERT:  No, Your Honor.  We would rely upon the
20 uncontested portions of the presentence report as well as the
21 exhibits we admitted.  And I think I summarized most of the
22 salient points in my sentencing memo.
23         THE COURT:  Okay.  Thank you.
24         Does the defense have any evidence they want to
25 present on the role in the offense issue?

1         MR. PUGH:  No, Your Honor, other than the evidence
2 that's already been received.
3         THE COURT:  Okay.  Mr. Reinert, it's your burden of
4 proof by a preponderance of the evidence, so let me grab your
5 brief.
6         MR. REINERT:  And I won't repeat everything that's in
7 my brief.  And the Court is well aware what the case law is and
8 what the requirements are for -- to get a role in the offense
9 increase, but there are -- I think clearly involved in this
10 overall activity there are five or more participants.  We've got
11 Farren Dean Doctor, the multiple teams -- at least the defendant
12 told us about three different teams of individuals in Canada,
13 Jason Boyachek, Munchi Mambo, Kopp, Breneman.  There's just a
14 whole host of --
15         THE COURT:  How many have I sentenced already?
16         MR. REINERT:  This is the fifth.
17         THE COURT:  Fifth, yeah.
18         MR. REINERT:  So you've already had five in court, so
19 there's clearly more than five participants.
20         THE COURT:  Right.
21         MR. REINERT:  So it boils down to did the defendant
22 either supervise someone, and even if you don't count five, it's
23 still clearly otherwise extensive given the quantity and
24 geographic scope.  Did the defendant supervise or play a
25 supervisory role?

1         In this case he managed the assets of the activity.
2 We're not claiming that he's the organizer or leader or even set
3 up the Chicago hub, simply that he played a management role
4 there starting out as -- in the activity if you look at his
5 debriefing, it's kind of interesting watching the arc of his
6 involvement beginning as kind of a small marijuana grower
7 probably before that becomes relevant conduct and then going
8 into a transporter, becoming a money counter, then stepping up
9 into a leadership role where really Mr. Boyachek has to go back
10 to deal with supply problems.
11         He is then managing the activities of this hub getting
12 the marijuana from Canada, getting it transshipped to Boston and
13 New York, coordinating with the drivers getting the money back
14 from the drivers, counting it, getting it then shipped with
15 other drivers out to Los Angeles.
16         We know about maintaining the books even when he was just
17 a bookkeeper other people were writing in those ledgers.
18 Mr. Munchi Mambo at some point entered in the ledgers, but the
19 defendant was overall responsible which means he was working
20 under his supervision.
21         So we would suggest for those reasons as well as all
22 the reasons we've set forth in our brief that a role in the
23 offense increase is warranted.
24         THE COURT:  Does application note 2 of 3B1.1 come into
25 play at all in your view?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 7 of 24
to purchase a complete copy of this transcript.

1     MR. REINERT:  That he must -- you mean -- which
2  sentence of that application note?  The first or the second?
3  The first clearly says that has to have been a supervisor --
4          THE COURT:  Well, I'm talking about the second
5  sentence.
6          MR. REINERT:  The second sentence deals with an upward
7  departure.  I think I included that in my brief, although I
8  can't remember if the plea agreement precludes us seeking an
9  upward departure on any particular basis.  I have to
10  double-check.
11         THE COURT:  Well, I mean my point is that let's assume
12  for the sake of argument that he didn't exercise management
13  control over any of the persons.  Did he exercise management
14  control over any of the property or proceeds?
15         MR. REINERT:  I think he clearly did exercise that
16  kind of management and control.  We seized --
17         THE COURT:  Is counting the money enough?  Is that
18  management?  Or is that a ministerial task?
19         MR. REINERT:  The physical act of counting I would
20  suggest is probably more ministerial.  Especially when he's
21  working with the -- at the first phase of that project when
22  Mr. Boyachek was there, I think that's really more of a
23  ministerial task.  But once he becomes, for lack of a better
24  phrase, the accountable agent for the organization, once he
25  becomes the chief operating officer in Chicago when Boyachek

1  leaves, then he is responsible for managing the assets, making
2  sure all the money's there, counting it.  He even counted money
3  for one of the customers, Z, at one point to make sure all the
4  money was there.
5          Once one does that, I think they are managing the
6  assets.  Then you amass the currency and ship it off with
7  another distributor.  So I think that is management of the
8  assets that flow through that distribution hub.
9          THE COURT:  Well, let me ask you about paragraph 17
10  which my recollection is not objected to.
11         MR. REINERT:  Paragraph 17 of --
12         THE COURT:  Of the PSIR, I'm sorry.
13         MR. REINERT:  Yes, Your Honor.  I think this actually
14  came out of the plea agreement stipulated facts.
15         THE COURT:  And it's kind of about 50, 60 percent of
16  the way down where it says in Boyachek's absence the defendant
17  assumed responsibility for the entire Chicago distribution hub.
18         MR. REINERT:  Yes, Your Honor, I see that.
19         THE COURT:  Okay.  You know, at first glance that
20  sounds like he's a manager, but there's no real -- it's just --
21  to me it's a very vague statement, and where are the facts in
22  the sentencing record that establish what assuming
23  responsibility for the entire Chicago distribution hub are that
24  would allow me to conclude that he was actually a manager?
25         MR. REINERT:  I think that's when you read the rest --

1  if you read the rest of the paragraph, it sets forth he created
2  and maintained the records, he maintained the house, the
3  business location for the criminal activity -- and that's at the
4  bottom of that paragraph -- coordinated the delivery of
5  marijuana drivers, coordinated the currency pick-ups with
6  various couriers.  And earlier in the memo we talk about him
7  basically supervising the activities of another person making
8  entries into the currency log.
9          So the Court's correct, that one sentence is a
10  summary, but I think it's a summary of the other facts that are
11  contained in the sentencing record that show what does that mean
12  to be a manager of the hub?  Those are all the things that he
13  had to do and the other activities he engaged in.
14         THE COURT:  Well, for example, maintain the Kingsberry
15  house doesn't mean anything to me on the sentencing record that
16  I have.  I don't know what that means.  I can't conclude
17  anything with regard to a role in that.  And coordinated the
18  delivery of marijuana with the drivers and coordinated the
19  currency pick-ups with the various couriers, coordinated is
20  really kind of the problem we just saw with the agent.  It's not
21  clear to me -- certainly the agent conceded as he had to because
22  I read his report last night that there wasn't anything in the
23  report that indicated Mr. Downing exercised management control
24  over the drivers.  I realize he testified to that today, but
25  it's not in his report.

1          MR. REINERT:  The only report that the Court had right
2  now is the debriefing of the defendant.  Remember the other part
3  of what we're talking about is -- what the agent testified
4  about is in the controlled delivery.  And in the controlled
5  delivery -- Mr. Kopp is not a participant at the time of the
6  controlled delivery.  But at the controlled delivery, Mr. Kopp
7  contacts him.  Defendant says, "Hey, head to downtown Chicago.
8  When you get there, let me know where you are."
9          So Kopp calls and ultimately picks a spot and makes
10  the delivery.  But that direction of go to the downtown area and
11  call me when you get there in the controlled delivery is
12  indicative of the coordination efforts that the defendant had
13  with other drivers.  I think that's a fair inference as how that
14  kind of business practice would have worked.
15         So I think coordination of the drivers is going to be
16  come into the area and I'll meet you, you know, or go to a
17  specific location.  It may be any number of things.
18         THE COURT:  Yeah, but if coordinate means you get a
19  prepaid cell phone, you give the number to the organization, the
20  driver calls you to let you know where you're in Chicago and the
21  driver tells you where to meet him, you're not managing the
22  driver.  You're coordinating it, but you're not managing it.
23  And if the sentencing commission had wanted to penalize people
24  with upward departures for coordinating criminal activity, it
25  would have been very easy to do so, but they didn't do that.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 8 of 24

1 And so they require that they manage.
2 And I don't see in this sentencing record -- I think
3 it's a close call. But I think all you have is the agent's
4 testimony that on some occasions the defendant told the driver
5 where the location should be for the pick-up, and there's
6 nothing that corroborates that, and the actual controlled buy is
7 totally inconsistent with that.
8 MR. REINERT: Well, actually the controlled buy is not
9 inconsistent with that, Your Honor. I would disagree with that.
10 THE COURT: Okay.
11 MR. REINERT: Because in the controlled transaction
12 the -- Mr. Kopp contacted the defendant, and the defendant told
13 Mr. Kopp to go into the downtown Chicago area, and then Mr. Kopp
14 basically parked.
15 Now, what does it mean to select a location for the
16 transaction? As Mr. Breen pointed out, Chicago's a huge city.
17 Cook County's a huge area. It wasn't just a "You drive wherever
18 you want; I'm going to go wherever you are." It's a "You come
19 into this area in the metro area, come into the downtown Chicago
20 area, and when you get there, call me."
21 So I think that in and of itself in a large
22 metropolitan area is direction sufficient to show that the
23 defendant managed.
24 THE COURT: So by simply saying go to the downtown
25 area rather than a suburban area, it's the executive branch of

1 government's view that that constitutes management.
2 MR. REINERT: I believe in this particular case that
3 direction is sufficient to show a management and control, given
4 the facts and circumstances of this case and how it worked with
5 all of the drivers and all of the different communication
6 devices and communication techniques in this particular
7 conspiracy. I think that is sufficient.
8 THE COURT: Well, isn't it more consistent with the
9 language of paragraph 17 that it was coordination? I mean, I
10 didn't draft paragraph 17. I assume you did. You drafted the
11 offense conduct. You drafted the plea agreement. And it
12 doesn't say management in either one of those. It says
13 coordination. And you chose that word. I suppose you chose
14 that word because you had a contested issue going on and if you
15 put management in they wouldn't have agreed to it.
16 MR. REINERT: That's probably a fair assessment, Your
17 Honor.
18 THE COURT: But, you know, you did choose the word
19 coordination, and you're saying -- are you saying that
20 coordination is equivalent to management or just under the facts
21 of this particular case?
22 MR. REINERT: I think under the facts of this case it
23 is because when you're dealing with the type of -- I agree with
24 the Court it may not be coextensive all the time. But when you
25 look at the facts of the case here where you've got a large

1 organization shipping, you know, marijuana across the
2 international border in kind of a strange way where you've got,
3 you know, secreted in trucks being delivered by unwitting
4 drivers dropped off to knowing participants, stripped out of the
5 trucks and put into boxes and then transshipped to another
6 wholesale distribution point, to be then further distributed to,
7 you know, Boston and New York and local in Chicago, that kind
8 of -- and the money going the other way, not going back directly
9 to Canada but going to somewhere in Los Angeles for shipment,
10 how ever it gets back to Canada, through a hub, with a Chicago --
11 a centralized hub of not only the marijuana going in but the
12 money going back out, that kind of activity dealing with
13 drivers, multiple drivers here and there and, as the Court I'm
14 sure noted from the presentence report, even when Mr. Downing
15 was in custody, we had his Blackberry going off with another
16 delivery coming in with another driver that he would have to
17 work with. So that kind of activity in this particular case, I
18 think coordination does equal management under these facts.
19 THE COURT: Thank you. Who wants to argue for the
20 defense? Mr. Pugh?
21 You certainly have no problem, Mr. Reinert, proving
22 the other otherwise extensive part of the enhancement.
23 MR. PUGH: Thank you, Your Honor. And as a
24 preliminary matter, I know -- I did have the opportunity on
25 Friday to read the government's response regarding this issue,

1 and I have prepared some remarks. I didn't file anything in
2 writing because of the weekend and the short time frame.
3 But in terms of -- I want to start off under 3B1.1 and
4 the otherwise extensive prong and just to clarify because I
5 don't think that it was entirely clear to me as I read the
6 government's response that the enhancement or the adjustment
7 under 3B1.1 for otherwise extensive applies to the first prong
8 which would be a conspiracy of five or more participants whereas
9 the sentencing commission has suggested that in conspiracies
10 that may possibly not involve five or more participants the
11 Court under the first prong of 3B1.1 may enhance if the Court
12 finds the conspiracy was, quote, otherwise extensive.
13 So in this case I don't think there's any argument --
14 THE COURT: About the five or more, so we never reach
15 the or otherwise extensive.
16 MR. PUGH: Correct.
17 THE COURT: Right.
18 MR. PUGH: So reading that over that seemed to be sort
19 of a red herring, and I'd like to dismiss that and move on now
20 to the comments that I could in application note 2. The
21 government takes the position that the Court could apply an
22 adjustment -- I think that they do -- in this under 3B1.1 based
23 upon Mr. Downing's management of the assets.
24 In the first instance I want to clarify for the Court
25 the difference between an adjustment and an upward departure.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS  Document 180  Filed 10/30/08  Page 9 of 24

1  And the comment in there suggests that the Court may upward
2  depart based on a particular defendant's management or control
3  of the assets of the criminal enterprise. And that's a very,
4  very important distinction.
5       And one of the cases that I actually cited in my
6  variance motion but not for that purpose is United States versus
7  McFarlane found at 64 F. 3d 1235. And in that case the Eighth
8  Circuit actually goes on at length to really clarify what the
9  difference is between an adjustment and an upward departure.
10  Now, this case was decided in 1995. I would suggest to the
11  Court that many circuits are now taking the position that after
12  Booker there probably is no such thing as a, quote, upward
13  departure.
14       THE COURT: Well, I know the Seventh Circuit has taken
15  that position, but neither the Eighth Circuit nor I have taken
16  that position. I've done a number of upward departures
17  post-Booker and Gall, and I've done a number of downward
18  departures post-Booker and Gall. So I've read the Seventh
19  Circuit views on that. I happen not to share them. I think
20  there's a clear distinction between departures which are
21  guideline issues, remain in full effect, weren't affected at all
22  by Booker, and then once you compute the guideline range using
23  any upward departures -- you know, if that's true, if there are
24  no such thing as departures, then I guess the government can't
25  make a 5K1.1 motion because that's a downward departure.

1       MR. PUGH: And, Your Honor, actually the position that
2  you take is consistent with the defense bar position in Seventh
3  Circuit. And I do agree. I think maybe that the Seventh
4  Circuit what they're leaning towards on that is one of appellate
5  review in terms of the --
6       THE COURT: The overall reasonableness of the
7  sentence.
8       MR. PUGH: Correct.
9       THE COURT: But you judge -- but, see, the thing is in
10  my view you still judge departures, you know, with that
11  heartland language which has no application to variances because
12  there's no quota on variances. I don't have to find that a case
13  is extraordinary or outside the heartland. Applying the 3553(a)
14  factors, you could do a variance in every case and you should do
15  a variance in every case where the factors dictate one, whereas
16  a departure is really a different standard of review. And I
17  think I have less discretion in general to do departures than
18  variances. But that's more of a philosophical argument. But I
19  think we seem to be on the same page on that.
20       MR. PUGH: That's correct, Judge. And that's why I
21  mentioned the difference between an upward departure --
22       THE COURT: And I'm glad you pointed that out because
23  I didn't actually pick up on that when I read the application
24  note. I didn't draw the distinction in my own mind. So that
25  was very helpful to me that you picked up on that, and I

1  appreciate that.
2       MR. PUGH: The real important thing about it is that
3  an upward departure that's sort of explained or given a reason
4  in the application note is not an adjustment under 3B1.1.
5       THE COURT: That's right.
6       MR. PUGH: Which means, Judge, that the government's
7  argument -- and I am not accepting their factual argument
8  whatsoever. But the government's argument that the Court may
9  increase Mr. Downing's sentence or provide an upward departure
10  does not preclude the application of the safety valve in this
11  case because an upward departure under the auspices of this
12  application note does not cause an adjustment under 3B1.1. And
13  if the Court looks to the application note 5 of section 5C1.2,
14  that application note says a defendant is disqualified from the
15  safety valve only if he receives a, quote, adjustment under
16  3B1.1.
17       So putting that law aside, even if we were to accept
18  the government's factual and legal analysis that some sort of
19  upward departure would be warranted due to the fact that
20  Mr. Downing exercised some management control, that still means
21  that the safety valve is completely appropriate in this case,
22  and it also means that the mandatory minimum in this case no
23  longer applies if we even accept the government's argument
24  contained in their memorandum.
25       In terms of the facts, Judge, I know that during

1  Mr. Reinert's argument that he was just making that it's
2  absolutely clear to me that the Court has -- is very familiar
3  with the factual basis for this proposed enhancement and our
4  objections to that enhancement. And it really comes down to a
5  question of perspective in this case.
6       You saw during the testimony of Agent Cantrell that he
7  has clearly attempted to color or to perceive a certain event as
8  being a certain thing. And I think the Court was very, very
9  clear on something here, and I want to reiterate it. It's
10  contained in my objections that I submitted to the probation
11  department. It is also contained actually very clear in the DEA
12  6 or 302 or the debriefing report that was submitted as an
13  exhibit by the government, and that is the following: David
14  Downing remained an employee of another individual during the
15  entire course of his conduct in this case.
16       And in terms of the drivers in this case where the
17  government seems to suggest that our weakness and our objection
18  lies, the fact of the matter is -- and I think the Court can
19  probably take judicial notice of this fact -- the Court has
20  sentenced at least one of the drivers in this case, and that
21  driver -- I'm not privy to his plea agreement, but I'm assuming
22  the stipulated conduct contained in Mr. Kopp's plea agreement is
23  consistent with the stipulated conduct in Mr. Downing's plea
24  agreement to the extent that there is overlap.
25       And the facts of this case are absolutely

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 10 of 24

1 uncontradicted, and that is that the drivers in this case
2 received direction, management, and instruction from persons
3 other than David Downing. They were certainly people that were
4 completely divorced and higher up in the organization. And the
5 direction that persons like Mr. Kopp and persons like him
6 received was take marijuana to Chicago. And when you get there,
7 here are the persons that you're going to call. They're persons
8 that are unknown to persons situated like Mr. Kopp, and persons
9 like Mr. Kopp are not known to Mr. Downing.
10 It's very much of a blind text message-type enterprise
11 that happened here and that what happened in this case in the
12 controlled delivery is that the driver went to downtown Chicago
13 which was consistent with the instructions that he received from
14 somebody other than Mr. Downing. And when he arrived there, he
15 went to -- and I don't want to correct anybody -- it was an
16 Office Depot parking lot. He pulled into that Office Depot
17 parking lot, and he called Mr. Downing and told Mr. Downing,
18 "Here I am."
19 Mr. Downing goes there, picks up his portion of the
20 marijuana that had already been color coded for different
21 recipients somewhere way before Mr. Downing. Mr. Downing took
22 his portion, returned the truck with the unused marijuana that I
23 guess was destined to other customers or other recipients of
24 Mr. Kopp. And that's the facts in this case.
25 THE COURT: Well, Mr. Pugh, isn't there a

1 disagreement? I thought Mr. Reinert just told me that in the
2 actual controlled buy with Kopp your client directed him to go
3 downtown?
4 MR. PUGH: I don't think those are facts in the case.
5 I think Mr. Kopp as he was directed to called Mr. Downing and
6 Mr. Downing told Mr. Kopp to call me when you are in downtown
7 Chicago. And again, I mean, we get into this question of
8 perception. But all of that aside, there's no evidence in this
9 case that Mr. Downing managed, had supervisory control, or right
10 of decision over any other person in this case.
11 He was the end of the line underneath Mr. Boyachek,
12 and I don't think there's any disagreement between us and the
13 government, and you look in our plea agreement, you see that
14 Mr. Downing's pay in this case was dictated solely by
15 Mr. Boyachek, exactly what he would earn. Mr. Downing had no
16 stake in the venture in terms of percentages or anything like
17 that.
18 So I think that's also important when we get to
19 application note 2 and this issue of whether or not he managed
20 the assets. Mr. Downing was very clearly in this case a
21 bookkeeper. He kept notations of how much marijuana that he
22 received and how much money that he got back and that all of
23 that money in its totality, none kept by Mr. Downing, was sent
24 back to the people in Canada who supplied the marijuana.
25 Likewise, Mr. Downing had no right of management or

1 decision as far as price because he was sent just like in a
2 controlled delivery in this case premarked packages for certain
3 customers.
4 So, Judge, for that purposes we strongly disagree with
5 any upward departure or adjustment under either 3B1.1 or, of
6 course, the chapter 5 adjustment because I don't believe the
7 plea agreement allows for it in this case. And I'm not sure. I
8 would have to look at that.
9 But furthermore, the standard for an upward departure
10 is much different than --
11 THE COURT: The plea agreement may not allow for it,
12 but I'm not bound by your plea agreement, so I can do what I
13 want as long as it's supported by the evidence.
14 MR. PUGH: I understand that, Your Honor. What I'm
15 suggesting is maybe the government could not ask for it.
16 THE COURT: Right.
17 MR. PUGH: Because of the plea agreement.
18 THE COURT: And I was the one that brought it up, and
19 Mr. Reinert responded to my question. He didn't raise it.
20 MR. PUGH: But in finality, Your Honor, the standard
21 for an upward departure is different --
22 THE COURT: No, I fully understand that. Thank you.
23 MR. PUGH: Thank you, Your Honor.
24 THE COURT: Mr. Reinert.
25 MR. REINERT: Yes, Your Honor. Actually the plea

1 agreement does not preclude this. The plea agreement in
2 paragraph 15G which is kind of the overall other guideline
3 adjustments says the parties agree no other chapter 2 specific
4 offense characteristic, chapter 3 adjustments, or chapter 5
5 departures are applicable. Doesn't say anything about chapter 3
6 departures, so the plea agreement does not preclude this.
7 THE COURT: Mr. Reinert, did Dr. Kopp get a
8 three-level role adjustment upward?
9 MR. REINERT: I believe he did because he recruited
10 Breneman and played a management role with regard to
11 Mr. Breneman. And I think that's kind of the -- Mr. Pugh's
12 talked a little bit about red herrings, so I guess I'll talk a
13 little bit about red herrings. It all kind of depends on how
14 you slice the onion.
15 Each -- when you look at a -- this kind of conspiracy
16 is unusual in that it's an international global conglomerate
17 working together, but just like you're going to have, you know,
18 a corporation and subsidiary corporations, just because it's a
19 subsidiary corporation doesn't mean that the overall CEO of the
20 head corporation runs everything. There are managers and
21 leaders all the way down the line, and I think that's what this
22 case looks at is you've got cells of transporters. You've got
23 teams in Chicago -- or in Canada sending them down. You've got
24 bulk customers much further down the line than the defendant.
25 Saying that this defendant's at the end of the line is I

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS Document 180 Filed 10/30/08 Page 11 of 24

1  ludicrous.
2          THE COURT: Yeah, I was going to say he must have
3  smoked a whole lot of marijuana if it was the end of the line.
4          MR. REINERT: And he's admitted that he sent marijuana
5  on to Flea in Boston who has subsequently been indicted and
6  actually pled guilty whose real name escapes me as well as on to
7  New York and others. And to say that he was simply a bookkeeper
8  and employee I think begs the question as well because he was an
9  equity partner in the business.
10         If you look at paragraph 17 in the presentence report,
11  early on when defendant came down, Boyachek was -- who was
12  running the hub and was paid $200 a pound and the defendant made
13  50 to $75 per pound. But once Mr. Boyachek left -- again, just
14  a little bit further down, Boyachek went back to Canada. The
15  defendant then was making a hundred dollars a pound, and
16  Boyachek was making 125 to 150. He was still getting a larger
17  share, but the defendant was getting a greater share for
18  exercising greater responsibility.
19         One thing that --
20         THE COURT: Well, I don't disagree with that, but the
21  greater responsibility doesn't equate to management. It equates
22  to -- it could equate to coordination which could or could not
23  be management.
24         MR. REINERT: And we've had that discussion, Your
25  Honor. And I think in this case it does equate to management

1  over other individuals, you know, supervising others making
2  notations even in the bookkeeping functions, coordinating with
3  the drivers.
4          THE COURT: Well, where in the sentencing record does
5  it actually indicate that he supervised the other persons making
6  entries in the --
7          MR. REINERT: It's in the uncontested portion of the
8  presentence report, and I actually mentioned it in my sentencing
9  memorandum.
10         THE COURT: Okay. And show me that paragraph. I
11  remember reading that there were entries by another individual
12  and that individual had a nickname. I remember that part.
13         MR. REINERT: It was in paragraph 15. It says -- this
14  is in discussing the log that was seized. Further investigation
15  revealed that the handwriting in the notebooks that documented
16  the money counted or marijuana received were written by either
17  the defendant or -- the person I mentioned in my memo was MM
18  with a nickname of Munchi who on occasion assisted the defendant
19  with the cash counting or making ledgers. The defendant
20  maintained the records, and the defendant was basically --
21         THE COURT: So you're equating the word assist with
22  management.
23         MR. REINERT: Since he maintained -- since the
24  defendant maintained the overall responsibility for the accuracy
25  and completeness of that ledger, I think that's a fair

1  inference, that if someone else is making logs, he's responsible
2  for it to make sure that they're right.
3          I would like to talk a little bit about the
4  defendant's discussion of 5C which is -- I hadn't really thought
5  about much until he said it. There's a recent -- maybe it's not
6  that recent anymore. Maybe I'm just getting old. But there's
7  an Eighth Circuit case that talks about the application of the
8  safety valve to individuals who are assessed a two-level
9  enhancement for firearms. Judge Colloton wrote a decision
10  saying that it means that the 5C possession of the firearm and
11  the prohibition of getting 5C treatment is different than the
12  relevant conduct necessary to get a two-level enhancement.
13         And in that case the basic facts were a defendant got
14  a two-level enhancement because a codefendant had a firearm. He
15  didn't personally possess the firearm. 5C in discussing that
16  says that the defendant did not possess a firearm. And Judge
17  Colloton opined that the language is different for a reason and
18  they mean different things.
19         So if a defendant was assessed a two-level enhancement
20  for the firearm under 2D but did not encourage, entice, or
21  direct the firearm to be possessed by the other individual, but
22  the 5C factor looked at the personal possession of the firearm.
23         So I think what that means is you have to read the
24  guideline the way the guideline is written. And in this case I
25  think the defendant makes a good point that 5C1.2 (4) says if

1  the defendant was not an organizer, leader, manager, or
2  supervisor of others in the offense.
3          So the Court has talked about management of assets.
4  First of all he talked about if it's upward -- if it's an upward
5  departure versus a --
6          THE COURT: Adjustment.
7          MR. REINERT: -- an adjustment. I'm not sure that
8  really makes the difference. I think the difference is if it's
9  an adjustment, it's management of others. If it's an upward
10  departure, it's a management of the assets. And if it's a
11  management of the assets, it may not fall within the ambit of
12  5C1.2(a)(4).
13         I don't know -- I have not seen any cases on that at
14  all. I'm not suggesting that's the right answer. I'm just
15  suggesting I think that's what the language may suggest.
16         THE COURT: I think that's a pretty sound analysis.
17  Anything else?
18         MR. REINERT: No, Your Honor.
19         THE COURT: Very briefly, Mr. Pugh, anything else?
20         MR. PUGH: If I could, I might have lost at the end --
21  was the government suggesting that our interpretation of safety
22  valve being applicable in this case if the Court does not find
23  an adjustment under 3B1.1, is our analysis accurate on that
24  issue?
25         THE COURT: I think -- I understood Mr. Reinert to say

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 12 of 24

1  it wasn't inaccurate.

2  MR. PUGH: With that double negative, I'll sit down.

3  THE COURT: Okay. Thank you. Boy, this is a tough

4  question. It's a very close question.

5  Well, with regard to the agent's testimony, to the

6  extent that the agent's testimony goes beyond the written report

7  and implies that Defendant Downing exercised management control

8  over the drivers, I find that totally inconsistent with his

9  report, and I don't accept that testimony. I'm going by what's

10  in the report. And while the report is ambiguous and could

11  support the agent's testimony if I understood it correctly, it's

12  such a critical matter that if it actually happened that way, I

13  would expect any federal law enforcement officer to put that in

14  their report with no ambiguity whatsoever that the defendant

15  controlled or managed the directions of the driver.

16  And I think it's inconsistent with what actually

17  happened in the controlled buy. And even if there was a

18  discussion about location, to me that's more coordination than

19  actual management. And while coordination could I guess at some

20  point be considered management, if we're talking about the

21  driver, I don't consider that to be management. And I just

22  didn't find sufficient evidence in the sentencing record that

23  the government met its burden of proof by a preponderance of the

24  evidence to establish the three-level role enhancement, although

25  I think it's a very close question, and I appreciate the effort

1  of Mr. Reinert in articulating the government's view and

2  presenting the evidence, but I just don't find they carried

3  their burden of proof. So I'm not going to find a three-level

4  enhancement.

5  And that leaves us with -- oh, and I guess because I

6  brought it up, to the extent that application note 2 gives me

7  discretion to do an upward departure, I don't find the facts

8  sufficient in this case to warrant the exercise of my discretion

9  to depart upward on application note 2.

10  So we avoid the issue that the parties just discussed

11  about whether I could do a upward departure under application

12  note 2 and the defendant would still be eligible for the safety

13  valve.

14  So by my calculation the total offense level would now

15  be a 31 and the defendant's criminal history remains a 1, and

16  the advisory United States Sentencing Guideline range is 108 to

17  135.

18  And because of the way -- because of my ruling and the

19  safety valve doesn't apply, it really doesn't make any

20  difference -- sometimes it makes a difference, you need to do

21  the variance first to get down to the mandatory minimum. But

22  because there is no mandatory minimum here, I suggest we do the

23  substantial assistance departure first and then look at whether

24  a variance is appropriate. Do you have any objection to

25  proceeding that way?

1  MR. REINERT: No, Your Honor.

2  THE COURT: Okay. Mr. Reinert, I'd be happy to hear

3  from you with regard to the substantial assistance motion.

4  MR. REINERT: Your Honor, in order to discuss this

5  more fully, we'd ask -- in order to fully inform the Court of

6  what the defendant has done, I think I need to discuss some of

7  this that may be sensitive in nature, and we'd ask that the

8  Court close this portion of the hearing or at least seal this

9  portion of the record so it's not available on CM/ECF.

10  THE COURT: I think we actually have defense counsel,

11  probably a defendant -- I'm not sure. I don't know if the

12  defendant's in custody or not on the next case. It's up to you.

13  If you want me to clear the courtroom, I will, but it would be

14  removing one of your colleagues. I'm reluctant to do that.

15  MR. REINERT: I don't mind having an assistant here,

16  but having members of the public and having others available,

17  given the nature of this investigation and some of the interest

18  I think this may have generated both in the United States and in

19  another foreign country --

20  THE COURT: Okay. That's good. Defense have any

21  objection?

22  MR. PUGH: I do not, Your Honor.

23  THE COURT: Okay. Then anybody who's not an assistant

24  U.S. attorney I'd ask to leave, or a federal agent. And I'm

25  also going to seal the transcript with regard to the 5K1

1  findings, but I'm going to open court back up to announce the

2  extent of my departure. That's consistent with kind of how

3  we've done it lately.

4  MR. REINERT: That's correct, Your Honor.

5  MR. PUGH: Your Honor, if I may.

6  THE COURT: Yes.

7  MR. PUGH: After this portion, may I go get

8  Mr. Downing's family and bring them back in?

9  THE COURT: Yes, absolutely.

10  (Sealed proceedings are contained in a separate,

11  sealed volume.)

12  THE COURT: Mr. Pugh, how long have you been

13  practicing in the Northern District of Illinois?

14  MR. PUGH: Since 1997, Your Honor.

15  THE COURT: And Mr. Breen?

16  MR. BREEN: Since -- I was a Cook County prosecutor

17  from '72 to '81 and joined the federal bar in '82 I believe,

18  Your Honor.

19  THE COURT: Okay. My question for both of you is if

20  Mr. Downing was being sentenced in the Northern District of

21  Illinois rather than the Northern District of Iowa, what is your

22  professional opinion as an officer of the Court as to what

23  the -- if the U.S. Attorney's Office in the Northern District of

24  Illinois makes a recommendation what that recommendation would

25  be, and they may not make a recommendation or they may do it by

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 13 of 24

1 offense levels rather than percentages and we have to
2 extrapolate.
3 But -- so maybe you can speak a little bit more
4 generally. Is this higher or lower than what you would receive
5 in the Northern District of Illinois for identical substantial
6 assistance? I'm just curious. When I have out-of-state
7 lawyers, I always ask that question.
8 MR. PUGH: Typically in a case such as this, it would
9 be called a free fall departure, and what would happen is that
10 the district court would, after being apprised of the extent and
11 nature of the cooperation, typically in writing -- it would be
12 submitted to the Court and in the defendant's sentencing
13 memorandum, and then the defense attorneys would ask for
14 whatever sentence they would. Our U.S. attorneys do not usually
15 recommend a percentage off in a case like this.
16 THE COURT: Or a number of base offense levels off.
17 MR. PUGH: Right. I've been in the Eastern District
18 of Tennessee. And there the prosecutors would recommend to the
19 court, for instance, we think four points off, five points off
20 based on the 5K motion. Percentages, while they were kind of
21 prevalent a few years ago, after Booker, seems, first of all,
22 that more defendants are pleading blind than ever before but
23 that it's typically in a case like this with cooperation and
24 safety valve would be regarded as a free fall departure meaning
25 allowing the defense to ask whatever they'd like. And, you

1 know, I would say that --
2 THE COURT: I'm not so much interested in what you
3 would ask for, but I'm more interested in -- I know there is no
4 such thing as a typical district court judge in the Northern
5 District of Illinois, and I say that because I know at least
6 half of them. But what would a typical departure -- substantial
7 assistance departure be for identical or extremely similar
8 cooperation?
9 MR. PUGH: Based upon my assumption that Mr. Downing's
10 provided grand jury testimony that could lead to the indictment
11 of another person, I would say half off.
12 THE COURT: Mr. Breen?
13 MR. BREEN: Judge, that's interesting. Mr. Rueckert
14 and I were just kibitzing, Judge, and we came up with 40 to 50
15 percent off. That's our experience.
16 THE COURT: Okay. Great. Thank you so much.
17 Anything else either lawyer would like to add?
18 MR. REINERT: No, Your Honor.
19 MR. PUGH: No, Your Honor.
20 THE COURT: Well, based on my evaluation of the 5K1.1
21 factors, looking at the timeliness, nature and extent of the
22 defendant's assistance, truthfulness, completeness, and
23 reliability, and my evaluation of the significance and
24 usefulness of the defendant's assistance taking into
25 consideration the government's evaluation and the fact that on

1 factor (4) there's just an average danger of risk giving
2 significant weight to both timeliness and truthfulness,
3 completeness, and reliability and also based on my findings of
4 fact as to what the defendant did in terms of the nature and
5 extent of the defendant's assistance -- that part of it is
6 sealed -- I'm going to reduce the defendant's sentence from 108
7 months down to 72 months which is approximately a 33 percent
8 reduction.
9 Okay. Now we have your motion for a downward
10 variance. And I've read your brief. And I'd like to make a --
11 before you start on your motion for downward variance, I read
12 all the letters you provided in your September 4, 2008,
13 correspondence. And let me tell you my reaction to the vast
14 majority of them.
15 It showed a total lack of acceptance of the
16 defendant's criminal conduct. The letters would be in the
17 category of it's all about me either for the person who wrote it
18 or in reference to Mr. Downing. He's going to miss his kids --
19 his kid. He's not going to be there for his girlfriend, slash,
20 common law wife. He was a great guy.
21 And even, you know -- no one -- I mean, almost
22 everybody just said he made a poor choice like it was a single
23 choice that the defendant made.
24 The most, I thought, insulting -- and I don't know any
25 other way to put it -- would be the in-laws. I mean, I'd take

1 each one and make comments on them. I mean, I read them that
2 carefully, and I was up pretty late. But the one that really
3 caught my attention was be Exhibit D from the in-laws. I
4 rarely get offended by these so-called unsolicited letters. I
5 don't know why they call them unsolicited letters. I'm just
6 shocked that there's so many people in the country that all of a
7 sudden choose to write me letters but where they said David is
8 no criminal, maybe a moment of bad judgment but definitely not a
9 criminal by any stretch of the imagination.
10 That is insulting to me. It's insulting I think to
11 the United States -- I don't mean to speak for the U.S.
12 Attorney's Office. Nobody would generally accuse me of being
13 their arch defender. But I think it's insulting to the U.S.
14 Attorney's Office. I think it's insulting to the legislative
15 branch of government. It's insulting to the executive branch of
16 government. It's insulting to the judicial branch of
17 government.
18 And it shows -- you know, they may be wonderful
19 in-laws, but they are clueless as to the extent of the
20 defendant's involvement in this criminal conduct.
21 And so when I get a letter like that and read that,
22 David is no criminal, I mean, he's engaged in the largest
23 marijuana-trafficking scheme I have seen in 14 years as a United
24 States District Court judge. And we have the sixth heaviest
25 criminal caseload in the nation. We have the highest criminal

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 14 of 24

1 caseload of any district not on the southwest border, and we
2 have had for almost a decade. We've also led the nation in
3 number of criminal trials per judge in 8 out of the last 10
4 years of the 94 districts. So I have -- it's not a sleepy
5 little district with no criminal litigation. Like I indicated,
6 I've already sent more than 2,600 people to federal prison.
7 Significant -- a majority of those are on drug cases.
8      When I see letters like these and time after time
9 after time, all about David -- I'm just looking at my notes --
10 no regard for criminal conduct, I mean, letter after letter
11 there's just -- they characterize it as a mistake, an isolated
12 mistake in judgment, he's no criminal. He's a substantial
13 criminal by any stretch of the imagination.
14      And I realize that lawyers aren't responsible when
15 they give my name out as to what people are going to write in
16 the letters, and I realize the defendant isn't responsible for
17 that. But letters like that do absolutely nothing for me.
18      And the letter from the girlfriend or common law wife,
19 that was probably the worst of all. That showed absolutely not
20 a single ounce of recognition of this defendant's criminal
21 conduct, not a single recognition of the effect that this
22 defendant's criminal conduct could have on society.
23      I mean, there's no doubt in my mind that somebody this
24 defendant supplied marijuana to probably was in a car accident
25 and injured or killed somebody. I mean, the odds of that

1 happening are probably fairly high. Whether it happened or not
2 I have no way of knowing, but the odds of it are fairly
3 significant or somebody getting high and engaging in all kinds
4 of criminal conduct.
5      There wasn't a shred of recognition of that in all of
6 the exhibits. And I found that shocking.
7      So I'm just being as honest as I can with you. You
8 know, I realize a lot of people think very highly of him. I
9 understand that. But the total lack of -- even by his
10 girlfriend who had to know what was going on. I think the
11 defendant even admitted she knew what was going on. And to just
12 not even mention that -- the whole thing was about me, me, me,
13 me; I need David; our daughter needs David. No recognition at
14 all for his criminal conduct, huh-uh, just totally unbelievable
15 to me. It did not impress me. It did not help on your variance
16 motion. And I was just absolutely stunned by the tone of the
17 letters. So I just wanted you to know that. Now you can make
18 your variance motion.
19      MR. PUGH: Thank you, Your Honor.
20      THE COURT: And I'd like you to respond to my comments
21 too if you see it differently. You don't strike me as anybody
22 who's shy.
23      MR. PUGH: I'm not.
24      THE COURT: You're not a wallflower, Mr. Pugh.
25      MR. PUGH: First off, Your Honor, I'm going to respond

1 to what the Court has talked about, the letters. And I haven't
2 been doing this a tremendously long time, but I certainly -- and
3 the Court has vast more experience. As I have told other
4 families, not to disclose what I have communicated in this case,
5 but everybody's got a momma and everybody's got a wife. And it
6 seems to me that it's all too common when a person is facing the
7 type of case that they have here that friends and family come
8 out of the woodwork to extol the virtues of that person.
9      And I think that that's important in one vein because
10 for the Court's purposes and indeed for my purposes and indeed
11 for the government's purposes, all they really know about the
12 individual who has been charged with an offense is what's
13 contained in the indictment and what's contained in the
14 discovery file of the government's case. And most of the time
15 what's contained in the government's discovery file and what's
16 given to the defense attorneys to review is never very favorable
17 to an individual who is facing sentencing.
18      And what I have always counseled family to do is to
19 try to apprise the Court of the things about the defendant that
20 the Court does not know. The Court is well aware of the extent
21 and nature of David Downing's participation in this criminal
22 conduct.
23      THE COURT: But, Mr. Pugh, what weight would you give
24 a letter that's from the in-laws that says he's not a criminal,
25 not by any stretch of the imagination is he a criminal?

1      MR. PUGH: I disagree with that statement
2 wholeheartedly, and this is something as an attorney, not just
3 in this case but in other cases, that you find yourself
4 wrangling with with families, particularly parents, particularly
5 parents, which is why it's always been my desire to try to find
6 somebody who you can get people who know them on much more of a
7 tertiary level and no blood. I think letters from people that
8 are not blood related are actually far more compelling than they
9 are. I myself have not always been a great young man, but my
10 mother thinks that I have always been a great young man each and
11 every day.
12      But the particular issue what the Court has raised
13 with this case versus maybe some other cases that we all have
14 had experiences with is that considering Mr. Downing is here, as
15 the Court knows, unlawfully and will be deported immediately
16 upon serving any sentence that the Court serves, he has not had
17 the opportunity to have his family involved in sort of the -- in
18 sort of the genesis of this case on the criminal level, and
19 that's for a couple reasons.
20      One is the distance. His parents are people from very
21 modest backgrounds, do not have the opportunity to come to
22 Chicago and sit down with the attorneys and discuss, you know,
23 let me tell you exactly what your son did. That's one.
24      Two, any conversations that he's been able to have
25 with his parents about exactly what he had done were forbidden

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 15 of 24

1  by his attorneys for obvious reasons, because of the
2  communications out of the jail.
3          And third, because this was a proffer case, we all
4  signed agreements that I could not reveal to David's parents the
5  scope and breadth of his criminal conduct.
6          So to the extent that the in-laws think that he just
7  made a mistake, I'm sure that that's what their daughter told
8  them.
9          And again, I don't -- I'm certainly not defending
10  that, but it's probably somewhat understandable that a daughter
11  would tell the grandparents of the child and of her husband that
12  he's not really what they're making him out to be down there.
13          But I think today -- and those in-laws are here, and
14  his mother is here. I think today has probably provided a nice
15  opportunity for Mother and Mother-in-law to listen in this
16  courtroom and to understand that over a course of years David
17  Downing was on a regular basis involved in criminal conduct.
18  And while that may be lost on some of the authors of these
19  letters who are miles and miles away and most of whom had no
20  idea -- you know, they thought he was down here, you know, doing
21  some sort of legitimate business.
22          But it will not be lost when David Downing takes the
23  opportunity to discuss with the Court in his allocution because
24  we have spent a long time on that -- and I will say, Your
25  Honor -- and I make this representation -- that Mr. Downing not

1  unlike other persons that we have represented but different than
2  many individuals, Mr. Downing from the night of his arrest
3  through this period of incarceration and the things that he's
4  accomplished during that period of time has certainly come to
5  view this case and his involvement in this case and what his
6  actions caused not just of immediate harm but potentially down
7  the line, and, of course, as we learn now the sort of criminal
8  forces that are at work up the line from him, that this was not
9  just a guy selling joints at a Grateful Dead concert, you know,
10  and I realize that there is a -- as far as marijuana goes,
11  there's definitely varying school of thoughts on marijuana
12  versus maybe some other controlled substances. And I understand
13  that.
14          What I have always imparted, though, is you need to
15  step back from that issue. You need to look at what a
16  large-scale criminal enterprise does in terms of law enforcement
17  manpower, security at the border.
18          You know, at some point in time in this chain either
19  up or down there are bad guys. I will suggest to the Court that
20  the letters indicate and other factors in this case indicate
21  that David Downing is a good person who has done repeated bad
22  things in terms of this criminal conduct. And I hope that in
23  terms of the letters despite their --
24          THE COURT: Yeah, that came through.
25          MR. PUGH: -- their handicap that that did come

1  through.
2          THE COURT: And, you know, I appreciate your
3  explanation. I didn't really think that through about the fact
4  that -- I mean, it's now obvious to me that you indicated that
5  he can't really communicate by mail because it's all read and
6  cooperation plea agreement would, you know, prevent . . .
7          MR. PUGH: Had I allowed for that to happen or
8  counseled otherwise, I would imagine there would have been more
9  exhibits government's side for sentencing today.
10          THE COURT: Right.
11          MR. PUGH: So I'm glad Mr. Downing followed my advice.
12          THE COURT: Right. It was good advice, and he
13  followed it, and it led to this situation. And I do understand
14  the fact that they are parents and in most parents' eyes the
15  kids can do no wrong even though we always did. At least I did.
16          MR. PUGH: I did too, more than my share.
17          But in any event, if I could get back to the variance
18  motion -- and, Judge, I know we've taken a lot of your time this
19  morning. And the variance motion we submitted on behalf of
20  Mr. Downing I think is relatively lengthy and does frame many of
21  the issues for the Court to consider under section 3553(a), and
22  I would hope as we've asked in our memorandum that the parsimony
23  provision as been called guides the Court's decision making
24  in this case, that a sentence that's arrived at in this case be
25  sufficient but not greater than is necessary to reflect the

1  seriousness of the offense.
2          And this offense, regardless of what anybody thinks
3  about marijuana, was an incredibly serious offense and is not
4  lost -- might be lost on others but is not lost on the person
5  that you're sentencing. And he will speak to that issue.
6          I apologize deeply that the Court was unable to fully
7  read the letter or the life story that Mr. Downing provided. It
8  was provided to us very late because there had been an original
9  one that had been given in the PSR, and apparently they're only
10  allowed to write with a rubber pencil over there at Dakota
11  County. So I even had a difficult time with the original in
12  this case.
13          THE COURT: Yeah, a copy was just hard. I mean, I did
14  my best to read it because I know it's important.
15          MR. PUGH: I hope that the Court was able to take away
16  some information out of that.
17          THE COURT: Oh.
18          MR. PUGH: And I've asked since the Court made these
19  concerns this morning that Mr. Downing in his allocution will
20  spend a few moments.
21          THE COURT: That's fine.
22          MR. PUGH: There's some very pointed and personal
23  information contained in that letter that would have been
24  difficult for any young man to tell a complete stranger in this
25  case. And I hope the Court paid attention to some of those

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 16 of 24

1   issues in terms of reflecting overall in the character of David
2   Downing and who he was and where he came from.
3          THE COURT: Would you -- I did read your brief, but
4   would you comment on any -- on the issue of unwarranted
5   sentencing disparity among codefendants?
6          MR. PUGH: I would. I would comment on that. I do
7   know that Mr. Kopp in this case I believe received 40 months. I
8   understand that Mr. Niekamp received time considered served and
9   that Mr. Berger received maybe a periodic imprisonment sentence.
10  That was my understanding. Mr. Breneman, of course, waits in
11  the wings.
12         THE COURT: Actually I sentenced him yesterday.
13         MR. PUGH: Oh.
14         THE COURT: I don't even remember what I gave him. I
15  was just so busy, I don't even have any idea. Try to forget
16  them as soon as I do them.
17         MR. PUGH: I understand that -- I mean, I think
18  that -- I don't think. Our legislature believes that under 3553
19  unwarranted sentencing disparities is something that should
20  guide the Court's decisions. And our belief of this case is
21  that the sentence that the government had asked for in this case
22  which was 188 months less than a 5K1 departure in this case was
23  just completely out of whack with the prescriptions of section
24  3553(a).
25         I would suggest to the Court based on my view of the

1   evidence in this case and my view of the evidence that wasn't
2   presented, meaning the discovery file in this case, based
3   on -- bearing in mind the cooperation in this case, I think that
4   Mr. Downing's sentence should be somewhere in the nature of
5   Mr. Kopp's sentence that he received in this case.
6          Now, I do know this from speaking to some of the
7   lawyers. There may have been an issue at Mr. Kopp's sentencing
8   where the Court may have wanted to give Mr. Kopp less time but
9   that there was something in his plea agreement which I've never
10  seen which precluded that from occurring.
11         So I don't know the Court's mind, but it sounded to me
12  from what I've heard from the other lawyers that the Court was
13  of a mind and I think maybe even encouraged the attorneys to
14  even brief the issue whether the opportunity existed to give
15  Mr. Kopp less than 40 months. I'm assuming that he in his plea
16  agreement sort of foreclosed that possibility to ask for a
17  variance or something. I don't know.
18         But I do believe that in terms of reflecting
19  cooperation and the individual and things like that, I would say
20  that Mr. Downing's involvement in this case would prob -- I
21  would suggest, Judge, in terms of avoiding an unwarranted
22  sentencing disparity would be in the heartland of Mr. Kopp's
23  sentence in this case.
24         THE COURT: Well, but the quantities were dramatically
25  different between Kopp and your client. Your client has a much

1   higher base offense level.
2          MR. PUGH: I want to speak to that issue, and the
3   reason that Mr. Downing's base level offense is what it is in
4   this case, Judge, is because Mr. Downing proffered to those
5   quantities. And he, unlike other defendants in this case,
6   received in his plea a sentence that was consistent with every
7   scrap of marijuana that he ever dabbled in. And as is very
8   clear --
9          THE COURT: Well, that's not exactly true because his
10  admission about growing marijuana in British Columbia in 1997
11  and 1998 was not included in the drug quantity.
12         MR. PUGH: No. I think the total on that was about
13  150 pounds if I'm not mistaken.
14         THE COURT: Yeah.
15         MR. PUGH: But I don't believe that that would have
16  been relevant conduct.
17         THE COURT: Well, I understand that. But your
18  statement was every scrap of marijuana that he ever dabbled in.
19  That's not true. Do you agree that that's not true? You used
20  the word ever dabbled in.
21         MR. PUGH: You're right. You're right.
22         THE COURT: You didn't say this offense or relevant
23  conduct to this offense. I'm simply saying that's not true.
24         MR. PUGH: You're right. In an effort to be an
25  advocate, I went too far.

1          THE COURT: That's okay.
2          MR. PUGH: I will say this. In terms of the cannabis
3   that was part of this conspiracy and Mr. Downing's involvement
4   in Chicago of assisting this organization, Mr. Downing accepted
5   all of the cannabis that he was responsible for, whereas other
6   defendants in this case were allowed to plead guilty to lesser
7   quantities even though it was clear from the sentencing
8   memorandums that were submitted that their proffers in this
9   case, they spoke of being involved in this long before the
10  interdiction that occurred in this case.
11         And while, for instance, Mr. Niekamp was allowed to
12  just plead guilty to the cannabis he received from Mr. Kopp, it
13  was clear that when he proffered he told the government that he
14  had been doing this for much longer than when you guys caught
15  me, and yet he received the benefit of not having to plead
16  guilty to that.
17         I can't do anything about that. But just in terms of
18  globally looking at the defendants in this case, I'm going to
19  ask the Court to consider that, that factor, under trying to
20  avoid an unwarranted sentencing disparity.
21         I think that one of the -- one of the areas where I
22  think that -- and I know I'm taking up the Court's time.
23         THE COURT: That's okay. Every case is important.
24         MR. PUGH: I just want to suggest to the Court that
25  Mr. Downing's post-offense rehabilitation in this case which is

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 17 of 24

1 outlined at length in our memorandum -- and Miss Sturdevant
2 actually presented back to him his diploma and certificates and
3 things that he received -- he's done a heck of a job.
4 THE COURT: Made me feel dumb for taking three and a
5 half years to go through college.
6 MR. PUGH: And honestly, in my conversations with
7 Mr. Downing, he'd be further along -- but for the fact he was
8 transferred from Linn County to Dakota County and lost his
9 school books, he'd be even further along.
10 And I'll tell you this. For a lawyer receiving
11 correspondence from his client, I had a client 14 months ago who
12 couldn't even spell writing in pencil and illegible handwriting,
13 and now I actually have a client who in a short period of time
14 has actually been able to put together written cohesive thoughts
15 and to convey them in such a way and had the opportunity to sit
16 down and discuss Supreme Court case law in an intelligent
17 manner, and this was a kid who dropped out of high school.
18 So there has been some extraordinary post-offense
19 rehabilitation, Judge, and under section 3553(a), I'd used ask
20 you to fashion a sentence in this case, you know, as I know you
21 will that is sufficient but not greater than necessary in this
22 case bearing in mind all of the issues that we provided you.
23 THE COURT: Thank you.
24 Mr. Reinert, you can comment on anything with regard
25 to the variance motion, but I'm particularly interested because

1 you have probably the best knowledge of anybody in the courtroom
2 as to the relative culpability at least in the prosecutor's
3 view.
4 MR. REINERT: Yes, Your Honor. First to talk about
5 relevant culpability in regard to what defendant talked about on
6 others being involved for much longer and being allowed to plead
7 to lesser quantities, I think the defendant misunderstands the
8 situation. I think the Court has a better handle on it at this
9 point because the Court has seen this is a very cellular
10 operation, that the defendant was serving at a hub and was
11 involved in the drug ledgers that we had -- before the defendant
12 even opened his mouth showed more than 3.5 million dollars going
13 through and over 8,000 pounds of marijuana, whereas Mr. Niekamp
14 and Mr. Berger who were the only defendants who pled to lesser
15 statutory quantities were involved in a cell getting a very
16 small portion of the drugs that came through Mr. Kopp. So those
17 are differences.
18 But as these defendants have stacked up at this point,
19 we had Mr. Berger who is at the low end of the spectrum got 65
20 days. Mr. Niekamp got time served which was at that point 14
21 months. Mr. Breneman, yesterday the Court sentenced
22 Mr. Breneman to 25 months which was -- and then Mr. Kopp got 40
23 months. Defendant's indication that the Court wanted to do a
24 smaller sentence or desired to do a lower sentence, I was at
25 Mr. Kopp's sentencing. I don't recall any of that kind of

1 discussion.
2 THE COURT: If I wanted to give a lower sentence, I
3 would have.
4 MR. REINERT: There was nothing in the plea -- it was
5 not a binding plea agreement.
6 THE COURT: Right. There wasn't anything in the plea
7 agreement that prevented me from giving a lower sentence.
8 MR. REINERT: So I'm sure if the Court wanted to do a
9 lower sentence the Court certainly would have done a lower
10 sentence. The Court's not shy about that.
11 THE COURT: Or about departing upward.
12 MR. REINERT: That's true. That's true.
13 THE COURT: I've done more upward departures than any
14 other district court judge in the Eighth Circuit.
15 MR. REINERT: Now, to say that -- I can't respond to
16 that because I haven't done the math on that one.
17 THE COURT: I have.
18 MR. REINERT: But to say that this defendant should be
19 on the same par with Mr. Kopp is I think ludicrous given the
20 scope of conduct. Mr. Kopp got involved relatively briefly.
21 His second load to Chicago was interdicted. This defendant was
22 involved for multiple years with multiple loads, multiple
23 drivers. Mr. Kopp's quantity with both loads together was about
24 1,200 pounds. This defendant's quantity is over 8,000 pounds, 8
25 times difference.

1 Mr. Kopp in his money laundering, that money
2 laundering was the profits sent to Mr. Kopp through the mail of
3 how much he earned for his activity, was about thirty-two or
4 thirty-four thousand dollars if memory serves me. This
5 defendant was involved in moving, packaging, and counting over
6 3.5 million dollars of proceeds from illegal activity. So
7 they're in a whole different ballpark.
8 And one of the things that Mr. Pugh said that kind of
9 amused me that this is not a defendant who was selling a joint
10 at a Grateful Dead concert, so I did a little math. I don't do
11 math very often, but I did a little math. Even if you assume a
12 gram per joint -- and a gram per joint would be a lot of
13 marijuana to go into a joint. But just assuming for sake of
14 mathematics a gram per joint, that's 1.6 million joints. And
15 odds are depending upon the joint, you probably look at more
16 like 3.2 million or more joints out of that. This certainly is
17 not a defendant selling a joint at a Grateful Dead concert.
18 THE COURT: Well, have you added up the total number
19 of people that have attended all of the Grateful Dead concerts
20 and then figured out what percentage smoked marijuana at the
21 concerts and then figured out the math, or did you stop there
22 you're at?
23 MR. REINERT: I stopped there because you have to --
24 it gets to be kind of high math to figure out how many are
25 smoking in the concert versus out in the parking lot, and that

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS Document 180 Filed 10/30/08 Page 18 of 24

1  just got too complicated for me, and there's too many
2  permutations.
3       This is a defendant who was functioning in a
4  high-level organization working at a high level. And when you
5  compare his sentence, the sentence that the Court has departed
6  down to of 72 months is really an appropriate sentence for this
7  defendant. There really is no need to further vary based upon
8  -- a 72-month sentence for a defendant involved with this kind
9  of quantity for this kind of duration with this kind of
10  individualized background is an appropriate sentence. We would
11  suggest that a variance is not warranted from the sentence that
12  the Court has discussed of 72 months.
13       THE COURT: Thank you.
14       Mr. Pugh, anything you want to add?
15       MR. PUGH: Nothing further, Your Honor.
16       THE COURT: Okay. Can you move the microphone towards
17  Mr. Downing?
18       MR. PUGH: Yes.
19       THE COURT: And, Mr. Downing, you have the right to
20  say anything to me that you want to before I impose sentence.
21  You have a Fifth Amendment right to remain silent. If you
22  exercise your right to remain silent, I cannot and will not hold
23  it against you in any way. And I want to make sure you
24  understand that while I did have a sentencing that was supposed
25  to start at nine and I always try and be on time -- I'm running

1  late for that -- it's more important to me that I hear
2  everything you have to say and that I consider it and that I
3  make the best decision I can in this case.
4       So I'm not thinking about the other case. They'll
5  just have to wait. It's unfortunate it got scheduled this way.
6  But right now you have my undivided attention, and I want you to
7  take all the time that you feel is necessary to tell me
8  everything you want me to know about yourself before I have to
9  make the final decision; okay?
10       THE DEFENDANT: Okay. Thank you. I'd just like to
11  say sorry for what I did. I want to apologize to you and the
12  courts and the people of this country. When I came down this
13  last time for this job, I never really thought of the risks that
14  would be involved for the harms of the people. I really was
15  just trying to take a job to pay off a debt. I'm not the
16  fastest learner.
17       I've been coming to this country for a long time with
18  my family. And I'm just sorry for what I did. I know this is
19  all my fault, and I deserve to be punished. Just please take
20  into consideration the 30 years I lived before that job. And
21  when you hand down my sentence, think about that, the 16 months
22  I have endured and what I've did. I pray that you see that I've
23  learned my lessons and that I have a lot of good to offer this
24  world and you'll give me a second chance. Thank you.
25       THE COURT: I think you cut it short from what your

1  lawyer indicated, and I don't want you to do that. So I
2  really -- I really mean it when I said you take all the time.
3  Every sentencing is very important, and I'm going to do the same
4  thing in the next sentencing. We'll probably go into my lunch
5  hour, and that's fine. But it's very important that I hear
6  everything you have to say because I have very often reduced
7  defendants' sentences, and I've on occasion increased
8  defendants' sentences based on what they've said.
9       So I just don't want you to feel that you've been cut
10  short, and Mr. Pugh indicated you had more things to say.
11       THE DEFENDANT: Well, that letter that I wrote to you
12  which I apologize again for, I didn't plan on writing it until
13  the last minute because I planned on reading you a 18 -- or
14  10-page speech, but I just didn't want to take up the Court's
15  time, but then I had to place the burden on you for reading that
16  letter.
17       THE COURT: And, you know, you don't -- it's not like
18  you can type it on a computer and put it in WordPerfect and put
19  nice bold headings on it, you know, and so I muddled through it
20  as best I could but -- and you have better handwriting than I do
21  because I can't even read my own handwriting. So I've had a lot
22  of practice muddling through handwriting. But I wasn't able to
23  read every word. I certainly got the gist of it.
24       THE DEFENDANT: I gotta apologize. I'm not the best
25  public speaker. I just got a vocabulary in the last 16 months,

1  so I'm -- bear with me. But I don't know. The -- I can't -- I
2  just can't say nothing. I'm sorry.
3       THE COURT: Mr. Pugh, are there any other points you'd
4  like to make on behalf of Mr. Downing?
5       MR. PUGH: Judge -- Your Honor, I would, and I'd let
6  the record reflect that Mr. Downing has some six pages in front
7  of him to read to the Court in his allocution. And he's unable
8  to get the words out. So I will attempt to summarize because I
9  have talked to him about it.
10       David Downing in the letter in the life story that he
11  conveyed to Your Honor and has conveyed to myself through
12  personal meetings, his other attorneys and in sort of the drafts
13  of, you know, what he would like to tell you has certainly
14  conveyed in terms of the history and characteristics of him who
15  he is and where he comes from.
16       I've had the opportunity to meet his parents. They
17  are people -- persons of -- good, hard-working folks of very
18  humble beginnings from rural Ontario.
19       Mr. Downing in that life story to the extent that you
20  were able to -- and I will highlight some portions that may not
21  have been legible for the Court, but he talks about -- you know,
22  he talks about sort of the divorce in his home and the direction
23  that his sister took. And within that letter one of the things
24  that I find mention in our sentencing memorandum that Mr. Downing
25  has not only shown remorse in terms of how his conduct harmed

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS Document 180 Filed 10/30/08 Page 19 of 24

1  society as a whole and his immediate family due to the fact that
2  he was caught, one of the things that I found and I think that,
3  Judge, you would have found and he would have spoke to in this
4  issue is how his -- the months away has provided him with an
5  opportunity not only to realize but to vocalize -- and I was
6  hoping to hear it today. I know it's written right in front of
7  him -- but that he's able to take the time -- and it kind of
8  maybe goes back to sort of the Quaker derivation of the word
9  penitentiary, almost a penance that has occurred during his
10 absence and probably more so I would say because Mr. -- for
11 Mr. Downing because not only is he a long way away from home,
12 but he's in a country and probably is very dissimilar than a lot
13 of people I saw him incarcerated with in Linn County in terms of
14 his history and background. He was able to spend more time
15 alone reflecting upon it.
16        And one of the things he really came to reflect is not
17 only did his criminal conduct harm society, but his involvement
18 in crime made him an absentee individual from his sister's life
19 who has now -- her and her children have sort of floundered, and
20 maybe there might be some ego there, and we all have a little
21 overemphasis on how much his presence would have meant to these
22 children and her. But that certainly has become in my opinion
23 one of the deepest sources of his regrets.
24        The other thing that he does apprise the Court of and
25 I really wanted him to talk about today is that one of the

1  things that led to his dropping out of high school and moving
2  out of Barrie, Ontario, and out to the west coast was some
3  difficulties that he experienced as a young man coming up
4  through high school.
5        Mr. Downing has conveyed to his attorneys and he did
6  in this letter -- and I don't know if that was legible or not,
7  but Mr. Downing was an incredibly late bloomer physically just
8  for lack of a better word. And for a young jock who played
9  hockey in a lot of locker rooms and things like that it became
10 almost -- and we talked about it at length -- it became an issue
11 of terror for him in his eighth and ninth and tenth grades, the
12 thought of, you know, making him quit the hockey team rather
13 than enduring sort of ridicule and things like that. And it's
14 what kind of fueled the pack up and leave Barrie High School and
15 head out to the hills of Whistler.
16        Mr. Downing and I have discussed at length and it was
17 contained in here his first winter in Whistler living in a
18 trailer with no electricity, you know, trying to sort of make
19 ends meet and put it together up there.
20        And he does talk in the personal history that he
21 provided and I wanted him to talk today that a lot of the
22 insecurities he developed, you know, in his teenage years and
23 that weren't until he physically kind of caught up with the rest
24 of society shaped his decision makings.
25        And I do believe that there's a certain degree of --

1  that I have seen in Mr. Downing of sort of misplaced ego in
2  terms of self importance and the importance to family and
3  everything like that.
4        But I know that one thing rings true through it and
5  has rung true through the letters is that this is a young man
6  who really, really wants an ideal. He is an idealist. He wants
7  an ideal, and he wants the perfect family, and he wanted the
8  successful business, and he wanted all these things and was too
9  immature really and poorly educated to realize the difficulties
10 of running a business.
11        His very good friend who his letter is there -- and I
12 actually think his letter is pretty honest -- Chris Miron is
13 here today, the fella who owns the restaurant in Whistler and
14 who was unaware of -- and had Mr. Miron testified today would
15 have told the Court that, you know, I heard rumbling of David
16 heading to Chicago, and he had left Whistler to come to
17 Vancouver to tell him, man, are you crazy, and David was gone
18 and off about this venture under Boyachek.
19        But, you know, David was naive, and I think he's
20 realized that now, that he didn't have the education, he didn't
21 have the emotional wherewithal to handle sort of the stresses of
22 parenthood and running a business. And the fact of the matter
23 is he should have been going back to school back then rather
24 than coming down to Chicago and doing this. And I think that
25 he's realized that, Judge.

1        I do think in finality knowing Mr. Downing the way
2  that I do and the things that's conveyed, his risk of recidivism
3  in this case, Judge, is next to nothing. And I would ask the
4  Court to consider that.
5        And I would ask the Court if the Court has some
6  questions for Mr. Downing query him now and maybe that would
7  spark him. I can sense sitting next to this young man he's so
8  thick in the throat he can't get it out. Speaking in these --
9  under these circumstances is bad enough, but doing so in sort of
10 this -- with this majesty surrounding you is unnerving even for
11 lawyers let alone somebody who's been incarcerated for 14
12 months.
13        THE COURT: I can appreciate that. Thank you. I just
14 wanted to take a moment and -- there's just a note that this
15 delay in my next case has caused the parties to reach a
16 stipulation. There were many, many contested guideline issues,
17 so things work out for a reason; right?
18        I wanted to take a minute and reread the letter
19 written by Mr. Miron, and I don't know how it got to me actually
20 because it was the eastern district of Iowa in Sioux Falls,
21 Iowa, so we got close, but I guess it was probably sent in a
22 packet and not mailed. But, you know, anybody who's traveling a
23 great distance -- I did read all the letters last night, but I
24 gotta tell you, I was really tired, and I read all of the
25 information again this morning, but I want to reread this letter

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 20 of 24

1 because the gentleman's taken time out of his very busy life to
2 come and support his friend. And so I'm just -- it's worth it
3 to me to reread it, so I'm just going to take a minute and do
4 that. I'm talking about Exhibit H now.
5 Mr. Downing, I'm sure you know this, but I've often
6 told my college freshman daughter that if you have two or three
7 good friends in life, you're blessed and if you have one you're
8 pretty lucky. And so you're a lucky guy. You're not lucky
9 because of where you're sitting today, but you're lucky to have
10 a friend like Christopher. I think you understand that.
11 I really don't have any questions for Mr. Downing.
12 Sometimes I ask a lot of questions, and sometimes I don't. So
13 I'd like to take another short recess and then come back and
14 pronounce sentence, just a five-minute recess. Thank you.
15 (Recess at 10:27 a.m.)
16 THE COURT: Thank you. Please be seated.
17 Mr. Pugh, is there a recommendation for a facility?
18 MR. PUGH: Judge, we would be seeking Oxford,
19 Wisconsin.
20 THE COURT: Is there any desire by Mr. Downing to
21 participate in the treaty transfer and serve his time in Canada?
22 Have you had a chance to talk about that? I actually don't know
23 a whole lot about that. I'm a little bit more familiar with the
24 Mexico one, but I know it's so rare that we have so many more
25 Hispanic defendants in our federal prisons than they have

1 Americans that they don't get -- and I don't know anything about
2 how it works in Canada. I sentence very few Canadian citizens.
3 MR. PUGH: We have discussed that. I've actually
4 discussed it with the government for quite some time now. I do
5 believe the government, while would not advocate it, would not
6 oppose it so long as considering Mr. Downing's cooperation, as
7 long as he was around for potential future cooperation and
8 things like that. I think once those possibilities cease to
9 exist --
10 THE COURT: Then a transfer might be in order.
11 MR. PUGH: Government would not oppose it, and I think
12 that's correct.
13 THE COURT: Mr. Reinert, is that accurate?
14 MR. REINERT: Your Honor, I know probably less than
15 you do about the treaty transfer.
16 THE COURT: That's not possible actually, Mr. Reinert.
17 MR. REINERT: I know there is a program, and I know
18 from my -- I had one chat with the treaty -- the guy who does
19 all the treaty decisions for all of DOJ, and he said every --
20 when I asked him kind of generally the question of how does this
21 work, I was told every country is different, and he gave me a
22 little bit of detail about how the Mexican one works. I have no
23 idea whether the defendant would be eligible or when he would be
24 eligible for that.
25 If he decides to participate in the treaty transfer

1 program early on, I know there's an opportunity that it goes up
2 to the department and they seek our input at that point and at
3 that point we'll have to kind of figure out where we are on
4 whether we can do anything else with his cooperation. But it's
5 kind of an open question at this point.
6 THE COURT: Can I try and summarize it? Would both
7 sides be comfortable with me -- first of all, judicial
8 recommendations to the Bureau of Prisons are very much
9 overrated. And I've spoken to the BOP about that on numerous
10 occasions, not that I'm upset. I'm not upset with it. Just to
11 gain a greater understanding of how they treat our
12 recommendations, but they're pretty overrated.
13 What I thought I might do would be to recommend that
14 he remain in the United States for like the next 18 or 24 months
15 and then be considered for a transfer.
16 MR. REINERT: I think whatever you put in the judgment
17 order -- I know one of the things that the department always
18 is -- at least in commutation of sentence and those kind of
19 things, they're always wondering what the district court thinks.
20 So if the Court even puts in the J and C the Court has no
21 opposition for him being considered favorably for the treaty
22 transfer program, at least when we respond to the request from
23 the department, we can at least include the judgment order and
24 the Court's position on that.
25 THE COURT: Okay. So would you rather just have me

1 say I have no opposition to him being allowed to participate in
2 the treaty transfer program and not put any time restriction on
3 it?
4 MR. REINERT: I think so, Your Honor, because putting
5 the time restriction on it might unduly complicate the matter.
6 THE COURT: Okay. But I understand it's in the
7 defendant's best interests to probably be available to do any
8 substantial assistance and hope to get a Rule 35(b) sentencing
9 reduction.
10 MR. REINERT: Right.
11 THE COURT: Would you have a problem bringing him back
12 from Canada? It could be problematic I would think.
13 MR. REINERT: It could be difficult.
14 THE COURT: Because it's really up to the Canadian
15 government whether they want to let you do that.
16 MR. REINERT: It's up to them, and it's also up to our
17 government. Since he's been deported, we'd have to do an S
18 visa. It's a whole can of worms to try and do that. Trying to
19 get somebody out to prosecute them from a foreign country is
20 difficult. Trying to get them back as a witness after they've
21 been prosecuted is I think another level of difficulty.
22 MR. PUGH: Judge?
23 THE COURT: Mr. Pugh's going to solve our problem
24 here.
25 MR. PUGH: I'm not going to solve the problem, Your

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 21 of 24

1  Honor, but I did speak with -- a woman attorney was referred to
2  me in Washington who apparently spec -- this is her bailiwick.
3  And what she told me as the state of affairs today regarding a
4  type of case such as Mr. Downing's is that, one, Canada is
5  typically reticent to take narcotics offenders, meaning that
6  there's a lot of -- apparently a lot of Canadian swindlers that
7  are doing time in the United States who I guess get the first
8  seat on the bus, so to speak, and that's Canada's decision.
9          The other thing is it is a process that needs to be
10  started soon because it takes a incredibly long time assuming
11  that it's even going to happen.
12      So I would suggest, Your Honor, if I may that allowing
13  Mr. Downing to be designated by the Bureau of Prisons and go
14  where they designate him -- hopefully it would be Oxford -- one
15  of the reasons our selection of Oxford was it does make it sort
16  of neutral ground for myself and Mr. Reinert if there were some
17  post-sentencing issues to address, and the other reason is it is
18  relatively close to the Canadian border, and it is as far as
19  Chicago being a nice hub to fly into from -- he has family in
20  Toronto and British Columbia. It's kind of centrally located
21  for that purpose as well.
22      So what I would suggest maybe if the Court is of a
23  mind to say that the Court does not oppose his participation in
24  the treaty transfer program, that would allow the process to
25  begin which I'm told takes over a year or more for that to

1  occur.
2          I think if the Court put a time constraint in there it
3  may be interpreted by the BOP -- in my experience with the BOP
4  they typically interpret anything the Court puts in the judgment
5  order in a light most unfavorable to the person doing time. So
6  that may prevent him from even throwing his application out
7  there for a term of 18 or 24 months. That's all that I can
8  enlighten the Court on the issue.
9          THE COURT: Have you given any thought -- you probably
10  have, but the closest federal facility that I know of to
11  Vancouver area would be Sheridan, Oregon.
12          MR. PUGH: I am not familiar with that facility, Your
13  Honor.
14          THE COURT: Well, Sheridan, Oregon, opened in 1989.
15  It has a satellite camp that houses minimum security male
16  offenders. The camp has about 500 inmates. It has a limited
17  in-house college program.
18          MR. REINERT: Your Honor, the Court did recommend that
19  facility to a codefendant yesterday.
20          THE COURT: Yes. I realize I did. Now, do you see
21  that as a problem?
22          MR. REINERT: Probably so, Your Honor. I always -- I
23  routinely do --
24          THE COURT: These are nonviolent offenders.
25          MR. REINERT: But in an abundance of caution I usually

1  try and do -- because sometimes there are hard feelings even if
2  they're nonviolent offenders that I try to do separations, and
3  BOP prefers that we separate those folks, so I would -- it may
4  be first one in gets the best seat to there.
5          THE COURT: Okay.
6          MR. REINERT: I just wanted to make sure the Court
7  remembered that.
8          THE COURT: Oh. I appreciate that. There's a
9  substantial likelihood I did not remember, but I actually did in
10  this case because it was just yesterday, but I appreciate you --
11  you know me well, and so I appreciate that. But I actually did
12  remember.
13      You want me to just recommend Oxford and then
14  recommend the -- he be granted the treaty transfer?
15          MR. PUGH: I would, Your Honor. I don't think that,
16  for one, BOP will put codefendants together, at least initial
17  designation from my discussions with them because we've had
18  multiple defendants recommended to Oxford and one ends up in
19  Duluth just for that reason.
20      And the other thing is I don't believe the ICE
21  detainer would allow Mr. Downing to go to a facility as you
22  described as Sheridan.
23          THE COURT: Oh, he's not eligible for a camp because
24  of the detainer.
25          MR. PUGH: Right.

1          THE COURT: Right. I forgot about that.
2          MR. PUGH: Oxford has a medium min., but I think that
3  after he's started there if they decide they could put him over
4  in the camp on their own at Oxford which is why we picked a
5  facility that had both a medium and a camp present.
6          THE COURT: Right. That's a good point. But you're
7  right. He's not eligible for direct placement in a camp because
8  of his immigration status. Thank you.
9      Anything else either of the lawyers would like to add?
10      Okay. I need to rule on the defendant's motion for a
11  downward variance. In looking at the Title 18, 3553(a) factors,
12  I always look at in terms of kind of mitigating and aggravating
13  factors even though the appellate courts don't look at -- don't
14  use those terms. It seems to me that the nature and
15  circumstances of the offense, all due respect to the defense, is
16  an extremely aggravating factor in this case. I think the
17  duration of the defendant's involvement and the sheer amount of
18  drugs and money that went through his hands strongly weighs
19  against a variance in the case.
20      The history and characteristics of the defendant I
21  think are -- there are some positive things. The only negative
22  one I think would be his prior growing of marijuana that he
23  admitted to. There are a lot of positive things that I've
24  gleaned from the letter. He's obviously got strong family
25  support, strong friendship support, strong, you know, social

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 22 of 24

1 network so that when he gets out he's got a safety net that
2 should help him from reoffending.
3     I'm particularly impressed with what -- the
4 defendant's post-arrest rehabilitation. And I think in this
5 case -- I was just talking at the break with our senior United
6 States probation officer Stacy Sturdevant who's been on the job
7 for ten years, and she brought it up. She said, "I don't recall
8 a defendant ever getting college credit pretrial let alone from
9 various county jails that they've been shuffled to."
10     So I think Mr. Downing has engaged in extraordinary
11 post-offense rehabilitation in terms of -- everything you
12 indicated in your brief at page 11 and 12 but primarily the
13 educational opportunities he's taken advantage of. He's had to
14 have put in untold hours, made an incredible effort, and I don't
15 think that's necessarily easy to do from county jail facilities.
16 And so that isn't lost on me at all.
17     And I also think that he's used this time for self
18 reflection, and that was certainly indicated in his life
19 statement. And I think he is taking responsibility for his
20 criminal conduct, not making any excuses. And so I think those
21 are important attributes towards rehabilitation.
22     The sentence -- I am always concerned about
23 unwarranted sentencing disparity, and I tend to side more
24 closely with the U.S. Attorney's Office on this than I do with
25 the defense in terms of the conduct as it relates to the other

1 defendants that I've sentenced.
2     I think a sentence close to Kopp would be -- would
3 create unwarranted sentencing disparity in my view because I
4 just view the defendant Downing's, pardon the pun, role in the
5 offense greater than Kopp even though Kopp got the role
6 enhancement and this defendant didn't. The length of his
7 involvement and the sheer -- as I indicated, the sheer amount of
8 money and drugs that flowed through his hands strongly weigh
9 against a major variance in the case because I think it would
10 create unwarranted sentencing disparity.
11     So in looking at all of the factors -- and, you know,
12 I weighed every single factor that you raised in your brief.
13 And I'm just -- I'm pretty much stuck on the nature and
14 circumstances of the offense.
15     On the other hand, I do want to give a very small
16 variance. It's really a token variance. I've actually never
17 done what I consider to be a token variance before, but I wanted
18 Mr. Downing to know how much I appreciated his post-offense
19 rehabilitation efforts because I think they've been absolutely
20 extraordinary, and that should not go unnoticed.
21     And so I am going to vary very slightly from the 72
22 months down to a 69-month sentence. And I think a 69-month
23 sentence in this case avoids unwarranted sentencing disparity,
24 meets all of the requirements of 3553(a)(2), to reflect the
25 seriousness of the offense, promote respect for the law, and to

1 provide just punishment.
2     I think a lesser sentence -- and I've never said this
3 before in 14 -- going into my 15th year. I think a lesser
4 sentence would not provide just punishment in my view, and I'm
5 not a big punishment person unless I see a lot of violence, and
6 then I'm up at the high end doing an upward variance or
7 departure usually. But I think it is necessary. And I think we
8 have to deter others, so it's kind of a general deterrence.
9     Whether Mr. Downing's going to commit additional
10 crimes, you know, I'd like to think not based on everything I
11 read in the letters, but, you know, he does have that history
12 ten years earlier of growing marijuana. So I hope he doesn't.
13 So I just think the 69-month sentence meets all of the
14 sentencing objectives in 3553(a)(2).
15     So it is my judgment that you are hereby committed to
16 the custody of the Bureau of Prisons to be imprisoned for 69
17 months. In my view this sentence is sufficient but not greater
18 than necessary to comply with all of the sentencing purposes in
19 Title 18, 3553(a).
20     I'm going to recommend the institution at Oxford and
21 also recommend that you be granted a treaty transfer and be
22 allowed to serve your term of imprisonment in Canada.
23     While you're on supervised release -- I'm sorry.
24 You'll be placed on supervised release for five years. While
25 you're on supervised release, you can't violate any state,

1 local, or federal law. You can't use or possess any illegal
2 drugs. You cannot possess a firearm, ammunition, destructive
3 device, or dangerous weapon. You'll cooperate in the collection
4 of a DNA sample.
5     You'll have one special condition of supervised
6 release. If you are removed or deported from the United States,
7 you're not allowed to reenter unless you obtain permission from
8 the director of Homeland Security. In the likely event that you
9 are removed or deported, your supervised release will remain
10 active but unsupervised.
11     You don't have an ability to pay a fine, so the fine
12 is waived. $200 special assessment is due and owing. You are
13 remanded to the custody of the United States marshal to serve
14 this sentence. Upon the completed -- I'm sorry. Upon
15 completion of the committed portion of your sentence, you'll be
16 delivered to a duly authorized immigration official for removal.
17     You have a right to appeal the sentence that I've
18 imposed. If you decide to appeal, you need to file a written
19 notice of appeal with the clerk of our court within ten days
20 from the date I sign and, more importantly, file the judgment
21 entry. If you're unable to pay for an attorney or pay the costs
22 of an appeal, those costs will be paid on your behalf.
23     You have family and friends who have come a great
24 distance to visit, so I'm going to ask our U.S. marshals to
25 accommodate a visit at the conclusion of the sentencing.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 23 of 24

1  Is there anything else on behalf of the defense?

2  MR. PUGH: No, Your Honor.

3  THE COURT: Mr. Reinert, I wanted to give you an

4  opportunity to object to each and every ruling I've made and

5  object to the degree of the substantial assistance departure,

6  object to the fact that I did a variance, object to the extent

7  of the variance, object to my -- all the other rulings that were

8  adverse to the United States of America and anything else you

9  want to object to.

10  MR. REINERT: Well, Your Honor, I think we've already

11  made a record through the course of the hearing and objected to

12  the Court's rulings on role in the offense and anything else

13  that we felt was important or material.

14  THE COURT: Okay. Thank you.

15  I just wanted to thank the lawyers on both sides. You

16  know, I expect excellent representation of the United States

17  from Mr. Reinert, and he never lets me down. He did an

18  excellent job in kind of educating me in this pretty complex

19  case, and he's been very helpful to me in each of the

20  sentencings in trying to figure out relative culpability which

21  is always not easy to do because there are so many competing

22  factors. So I appreciate that very much.

23  And I really appreciate the defense lawyers in this

24  case. You did an outstanding job. You were super, super well

25  prepared, very thoughtful in your approach to sentencing.

---

1  And, Mr. Downing, I just hope you realize that you got

2  the gold standard of representation in this case. You didn't

3  get good representation. You got the gold standard, as good of

4  representation short of two death penalty cases that I've tried

5  that I've seen.

6  So you're all welcome back to the Northern District of

7  Iowa any time. And I just wanted to thank the defense lawyers

8  for taking their job so seriously and being such zealous

9  advocates on behalf of Mr. Downing. Thank you.

10  MR. BREEN: And I'd like to say, Judge, when you get

11  to downtown Chicago, call me, but that's . . .

12  THE COURT: I will because I've got a daughter who

13  just enrolled at Lake Forest.

14  MR. BREEN: Don't let Mr. Reinert know I said that.

15  He'd charge me with managing.

16  THE COURT: There you go. Well, I really do

17  appreciate the representation. You've just been terrific to

18  deal with. And my secretary said you're incredible to deal

19  with, and that means a lot to me too so . . .

20  MR. PUGH: Well, it's been a pure pleasure for us,

21  Judge, and we certainly definitely heard a lot of great things

22  about your court, and we're looking forward to --

23  THE COURT: That was the other judges of our court,

24  but I'll take credit for that.

25  MR. PUGH: But we were told be very, very well

---

1  prepared.

2  THE COURT: That was good advice.

3  MR. PUGH: Not that we wouldn't be, but it provided an

4  added level of insecurity on our part.

5  THE COURT: Well, I'm glad. That's the reputation

6  I've tried to cultivate over 14 years, so I'm glad word gets

7  out. Appreciate it. Thank you very much. We'll be in recess.

8  (The foregoing sentencing was

9  concluded at 10:54 a.m.)

20  CERTIFICATE

21  I certify that the foregoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

25  S/Shelly Semmler          10-24-08

Shelly Semmler, RMR, CRR          Date

---

INDEX

WITNESS:                                    PAGE:

CHRISTOPHER CANTRELL
    MR. REINERT                              16
    MR. BREEN                                19
                    *****

EXHIBITS:

    1 and 2                                   2
                    *****

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 6:07-cr-02012-MWB-LTS   Document 180   Filed 10/30/08   Page 24 of 24